# WILSON *v.* STATE OF MARYLAND

[No. 254, September Term, 1970.]

*Decided April 16, 1971.*

552

*Motion for rehearing filed May 17, 1971; denied May 31, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Leonard S. Freedman* and *John D. Hackett* for appellant.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City, Fred K. Grant* and *Allen N. Horvitz, Assistant State's Attorneys for Baltimore City,* and *James A. Wise, State's Attorney for Caroline County,* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

On August 18, 1969, the appellant, Irving Lee Wilson, shot and killed one Walter "Kidd" Henderson. The incident occurred at approximately 12:30 P.M. in the Spot Bar in Baltimore. About 12:35 P.M., the appellant entered the Western District Police Station, announced to the desk sergeant that he had just killed a man in the Spot Bar and surrendered a .32 caliber revolver containing two live and four spent cartridges. At about 2:00 P.M. the appellant was questioned at the Western District Police Station by Detective Sergeant George Christian of the Homicide Division of the Baltimore City Police Department, who obtained an oral statement from him. A second oral statement was obtained at about 3:00 P.M. at Central District Police Headquarters by Det. Sgt. Christian in the presence of Assistant State's Attorney Fred K. Grant (who prosecuted the case below) and two other police officers.

The appellant was indicted August 19, 1969. The case was removed to the Circuit Court for Caroline County, and tried before a jury on December 17, 18, 19, 1969, with Chief Judge J. DeWeese Carter presiding. The defense twice made unsuccessful motions for judgment of acquittal during trial. Maryland Code (1971 Repl. Vol.) Art. 27, § 593; Maryland Rule 755. The jury found the appellant guilty of murder in the first degree without directing that the sentence be life imprisonment. Code

(1971 Repl. Vol.) Art. 27, §§ 412, 413. New counsel entered the case on behalf of the appellant and moved for a new trial. After a hearing on March 23, 24, 1970, the motion was denied, and Judge Carter imposed a sentence of death. An order for appeal was entered the same day. New counsel again entered the case on behalf of the appellant, and the appeal was brought directly to this Court. Code (1968 Repl. Vol.) Art. 5, § 12 and Code (1970 Cum. Supp.) Art. 5, § 5A (3).

Present counsel for the appellant suggest nine reasons in support of their request for a reversal of the conviction or a new trial. We find nothing in the arguments presented or from an independent review of the entire record which would merit reversal, and we therefore affirm the decision of the trial court. However, because of the seriousness of the crime and the nature of the sentence imposed, we shall discuss the appellant's contentions in some detail. Although nine separate grounds are contained in the appellant's brief, they resolve themselves into six major areas of contention, as follows:

## I. THE TESTIMONY OF BARBARA ANN LEWIS

The appellant urges that the testimony of Mrs. Barbara Ann Lewis (an eyewitness) was coerced by the State and contradictory in nature, and that to admit her testimony into evidence was reversible error.

As of August 18, 1969, Mrs. Lewis was a full time exotic dancer at the Gayety Club on Baltimore's "Block" and was also employed on a part-time basis as a barmaid at the Spot Bar. On the day in question she was working at the Spot Bar. Shortly after the shooting, she gave the police a signed statement to the effect that she had not seen the appellant at all that day, that she had not seen the appellant shoot Henderson, and that she had dropped behind the bar to the floor of the tavern when she heard the first shot. The next day she was summoned to testify before the grand jury, and just prior to her testifying was advised by the police and the prosecutor

of the penalties for perjury and told that she could be arrested and jailed if she lied to the grand jury. She changed her version of the incident before the grand jury, and testified that she had seen the appellant shoot and kill Henderson.

At the trial, although obviously reluctant to answer many of the questions put to her, Mrs. Lewis testified on direct examination by the State that she heard "some gun shots," saw Henderson run to the back of the bar, and saw the appellant shoot Henderson while the deceased was on the floor and after he had asked the appellant not to shoot him. She did not recall the number of shots that were fired.

On cross-examination she admitted that she had given a contradictory statement to the police on the day of the shooting and that the representatives of the State had discussed perjury with her before her testimony to the grand jury. However, she maintained that the police did not suggest any testimony to her, nor did they promise her anything in order to make her testify. She also maintained that she had told the truth to the grand jury and was telling the truth at trial. She admitted to having had an argument with the appellant two years prior to the shooting, in which the appellant accused her of being a lesbian, but she felt that they had been on good terms since that time.

Mrs. Lewis was recalled as a defense witness later in the trial and testified that she was fixing a drink for one of three unknown seamen in the bar at the time and that Harry Cole, the owner of the Spot Bar, and a girl known to her only as Margaret were also present. She heard what she thought were two or three gunshots coming from the front of the bar which was about 40 or 50 feet long. She turned around, was "shocked" at what she saw, "dropped to the floor and started crawling" about "half way down the bar," continued crawling "to the back" and "tried to get to the cellar." She stated that after the first series of shots, Henderson was running toward the rest

rooms in the back of the bar. Henderson fell "at the end of the bar" and the appellant "was behind him." Henderson asked the appellant "not to shoot him—not to kill him." Mrs. Lewis also stated that "[w]hen he [Henderson] fell to his knees, that's when he asked Irving Lee [Wilson] not to kill him, and he [the appellant] shot Kidd in the head." There then followed this colloquy among the appellant's attorney, the trial judge, and Mrs. Lewis:

"Q. You observed this entire affair,—
"A. Yes, I did.
"Q. Is that correct?
THE COURT: What do you mean by, "he shot Kidd?"
THE WITNESS: Irving Lee.
BY MR. RUBENSTEIN:
"Q. How many times did he shoot him?
"A. I don't know.
"Q. Is it then that you dropped behind the bar?
"A. After he shot Kidd?
"Q. Yes.
"A. Yes."

Whether or not the statement which Mrs. Lewis gave to the grand jury and repeated throughout the course of her examination at trial in recounting her version of the event was coerced, and therefore presumably untrue, was a question for the jury, and goes to the weight of evidence and the essential credibility of the witness involved. The appellant contends that the first statement Mrs. Lewis gave to the police "is more to be believed than the statement given later while under undue pressure" and states that it is "as logical, if not more logical, that a barmaid in a rough tavern, on hearing shooting, would instinctively drop to the floor and attempt to crawl away from a 'shoot out'." It appears equally probable that, as Mrs. Lewis testified, her first statement was false and that she lied to the police because she "just wanted to get out of the mess and go about my business." This seems

especially likely in view of her obvious displeasure at being involved in the entire matter even while testifying at trial. In any event, questions such as this are peculiarly within the province of the jury. It is apparent in this case that the jury chose to believe Mrs. Lewis' second version. She repeatedly stated that there was no inducement by the police to get her to testify as she did. She admitted that she was warned of the possibility of perjury prosecution if she lied to the grand jury, but maintained throughout that she told the grand jury the truth and was telling the truth at the trial. There is nothing in the record which supports the appellant's allegation of coercion, and there was no error in admitting the testimony into evidence and allowing the jury to evaluate it.

In a related argument, the appellant contends that the trial court erred by allowing the jury to choose between contradictory statements of Mrs. Lewis, and cites *Kucharczyk v. State,* 235 Md. 334, 201 A. 2d 683 (1964) as principal support for his position. The problem with such an argument is that *Kucharczyk* related to contradictory statements *at trial,* and stated that in that case the evidence was so unreliable on its face as to be without any probative value. The contradiction in the case at bar exists between the statement given by the witness prior to her testimony to the grand jury, and the later testimony before the grand jury and during the course of the trial. There was no contradiction in her testimony during trial or before the grand jury. Mrs. Lewis gave only one version of the events in question at the trial and that version was the same one she had given to the grand jury. See *Brooks v. Daley,* 242 Md. 185, 192, 218 A. 2d 184 (1966). The jury was well aware of the prior inconsistent statement of the witness, originally given to the police, and was faced with judging her credibility in the light of such inconsistency. That, of course, is a task for the jury rather than the appellate tribunal.

## II. SUFFICIENCY OF THE EVIDENCE
## AND SELF DEFENSE

The appellant next argues that the evidence presented was insufficient as a matter of law to sustain a conviction of first degree murder, and that the lower court's denial of his motions for judgment of acquittal made both at the close of the State's case, and again at the close of all testimony, was reversible error. Intertwined with his argument in this regard is a basic claim that he was acting in self-defense, and as stated by counsel for the appellant in their brief, "the fear, panic, prior knowledge of the decedent's propensity to homicide, the folkways of the underworld and the self-preservation instinct of the appellant should have been considered by the experienced trial judge to the end that first degree and possibly second degree murder acquittal motions should have been granted." [1]

In order for the appellant to justify a homicide on the basis of self-defense, he must have had "reasonable grounds to believe, and have in fact, believed himself to be in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant." *Tipton v. State,* 1 Md. App. 556, 560, 232 A. 2d 289 (1967). And, the burden is upon him to prove by a preponderance of the evidence that he acted in self-defense. *Chandler v. State,* 7 Md. App. 646, 651, 256 A. 2d 695 (1969).

In support of his actions, the appellant testified at trial that he had been working for Henderson delivering packages on a part-time basis for about ten months. He thought the packages contained "numbers slips," but he discovered that they contained narcotics instead, and

---

1. In their brief, counsel for the appellant stress that this case is a "classical" one of "chaud medley" and perhaps even "se defendendo." The terms would appear to be synonymous with the more meaningful classifications of justifiable and excusable homicide. Usage of the archaic terms accomplishes little other than to cloud the discussion. Whatever distinction might exist between the two, by whatever names, has little or no practical effect on the outcome of actual trials. See Whitehead v. State, 9 Md. App. 7, 10, 262 A. 2d 316 (1970).

three days before the shooting told Henderson that he "wanted out." Henderson supposedly told him to "hang on," that he would get $10,000, and that he knew too much about Henderson's business for him to let Wilson go. The appellant further testified that on August 16th, two days before the shooting and the day after his conversations with Henderson, three men attempted to kill him, shooting up his car, in the vicinity of the Spot Bar, but he escaped their fire. When he spoke to Henderson about the incident, the deceased allegedly told him "You know how those things are" and that there "Ain't no getting out now." They made arrangements to meet at the Spot Bar on Monday, August 18th, at about noon.

At the tavern, according to the appellant's testimony, Henderson beckoned him down the bar "a little past half way." The appellant asked for some "scratch." Henderson told him that he had no money, "and if you don't like that, you know what I can do." Appellant contends that at this point Henderson "backed off of me and put his hand under his shirt like he was pulling up his pants." Allegedly, the appellant had been with Henderson on a previous occasion when Henderson performed the same maneuver (at various times referred to as a "trouser dance") just prior to shooting and killing his victim. Apparently fearful of meeting an identical fate, the appellant drew his own gun, and fired several times at Henderson because he "didn't show any signs of being hit until I have hit him the third time I believe it was." Appellant further testified that "he didn't fall, and * * * as far as I'm concerned he was still trying to get his pistol out." (The appellant had earlier stated that when Henderson backed away he saw the barrel of a silver gun in his shirt, and that the deceased always carried a gun on his person.) He denied that Henderson ever asked him not to kill him, or that Henderson ever spoke a word while being shot.

On cross-examination, the appellant testified that the first shot he fired went into the floor of the tavern and would have "had to ricochet" if it hit the deceased. The

next three shots were fired directly at Henderson. Appellant denied that he had ever fired at Henderson when Henderson was on the floor and maintained that by the time the fourth shot was fired the deceased was falling forward, but he "couldn't say" whether Henderson's head was between the appellant's gun and the floor when he fired the fourth and final shot. Under questioning by his attorney, the appellant stated that he shot the deceased because he "feared that Mr. Henderson would have shot me" and he surrendered to the police "because they [Henderson's associates] would have killed me."

Tending somewhat to substantiate the appellant's testimony was a portion of the testimony given by Det. Sgt. Christian of the Baltimore City Police Department. Sgt. Christian stated that he obtained two oral statements from the appellant on the day of the shooting, the first at about 2:15 P.M. when he was alone with him at the Western District Station, and the second in the presence of other police officers at Central District Police Headquarters at about 3:00 P.M. In both statements the appellant noted that he was supposed to be paid $10,000 by Henderson at the Spot Bar, that there was an argument, and that he shot the deceased because he thought Henderson was going to shoot him when he saw Henderson reaching for his pants. Also, there was testimony by one Vernon Laws, an employee and associate of Henderson's who had accompanied him to the Spot Bar that day, but did not go inside with him. Mr. Laws testified that the deceased was known to carry a gun in a holster inside his pants.

Had this been the only testimony on the question of premeditated murder *vis a vis* self-defense, the appellant might have sustained his burden of proof, and a motion for judgment of acquittal may have been proper. However, there was other substantial evidence presented (in addition to the eyewitness account of Barbara Ann Lewis which contradicted the appellant's version of the events) tending to show a deliberate and premeditated killing.

First, there was the autopsy report (entered in evidence by stipulation of counsel) which discussed the four gunshot wounds and concluded that the victim must have been on the floor when one of the shots was fired, as one of the bullets had grazed his face and struck the floor, throwing off metal fragments which caused minor abrasions and cuts to the right side of the face. Second, there was the testimony of Officer Charles Owens of the Baltimore City Police Department that he was the first to arrive at the scene of the crime (at approximately 12:33 P.M.) and that he found no weapon on the deceased's person during a preliminary search of the body. Third, there was the testimony of Detective Howard Corbin of the Baltimore Police Department Homicide Squad that he found the deceased's gun in his automobile, which was parked across the street from the Spot bar. Fourth, there was the testimony of Mr. Laws who (in addition to his testimony mentioned earlier) stated that he did not see any gun on the deceased's person that day, and that, because of the kind of clothes which Henderson was wearing, he felt certain that he would have seen a gun had Henderson been wearing one. Fifth and last, there was the testimony of Sgt. Christian, who had taken the oral statements from the appellant. In addition to his previously mentioned testimony he also stated that (1) the appellant did not mention at either of the two questioning sessions on the day of the shooting that Henderson had a gun, (2) that the appellant had demonstrated to him the "dance" which Henderson had supposedly done prior to being shot, and that, as demonstrated by the appellant, his thumbs were tucked inside the waistband of his pants, with his hands visible, and (3) that the appellant had made no mention to him of Henderson having put his hand under his shirt.[2] He stated, also, that no gun had been found in a search of the tavern, and that, although he had not personally asked any of the other patrons of the Spot Bar whether they had seen a gun other

---

2. All of these points were contravened by the appellant during his testimony.

than the appellant's, Officer Owens had made such an inquiry and none had been seen.

As stated earlier, a defendant who relies on a claim of self-defense has the burden of proving it by a preponderance of the evidence. *Chandler v. State, supra.* In the absence of any showing of excuse, justification, or mitigation, it is presumed that all unlawful homicides are committed with malice aforethought and are therefore murder. *Gunther v. State,* 228 Md. 404, 408-409, 179 A. 2d 880 (1962) ; *Chisley v. State,* 202 Md. 87, 105, 95 A. 2d 577 (1953). The law in Maryland divides murder into grades. Code (1971 Repl. Vol.) Art. 27, §§ 407, 411. In such a case, it is presumed that the homicide was murder in the second degree, and in order for the State to elevate the crime to first degree murder it must show that the killing was wilful, deliberate, and premeditated. *Chisley v. State, id.* And, of course, the State must establish the defendant's guilt of the crime alleged beyond a reasonable doubt. *Johnson v. State,* 227 Md. 159, 163, 175 A. 2d 580 (1961). Such is the posture of the trial when the case goes to the jury for its verdict.

What, then, is the function of this Court when asked to rule on the sufficiency of the evidence adduced at trial? The standard for appellate review of a jury verdict in a criminal trial (whether by the court or by the jury) was stated as follows in *Royal v. State,* 236 Md. 443, 204 A. 2d 500 (1964) :

> "* * * in order to overturn a judgment entered on the verdict of a jury for insufficiency of the evidence it is necessary to show that there was no legally sufficient evidence or inferences drawable therefrom on which the jury could find a defendant guilty beyond a reasonable doubt." 236 Md. 448-449.

The appellant advances the proposition that the test to be applied in appellate review of the sufficiency of the evidence in a criminal case has been changed by the decision of the Court of Special Appeals in *Williams v. State,*

5 Md. App. 450, 247 A. 2d 731 (1968), by the insertion of the adverb "fairly" into the definition found in *Royal*, so that the *Williams* definition reads:

> "* * * the test is whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could *fairly* be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." (Emphasis supplied) 5 Md. App. 459.

The appellant argues that the insertion of the word "fairly" has cloaked the sufficiency test in an aura of ambiguity which creates an "estoppel to argument on appeal." Difficult as it may be to follow appellant's argument in this regard, the short answer to his contention is that the use of the word "fairly" as found in *Williams*, does not represent an innovation as the appellant would have us believe, but is merely repetitious of the test applied in appellate review of the sufficiency of evidence in a criminal case. See *Gibson v. State*, 238 Md. 414, 417, 209 A. 2d 242 (1965) ; *Graczyk v. State*, 233 Md. 245, 246, 196 A. 2d 469 (1964) ; *Mason v. State*, 225 Md. 74, 76, 169 A. 2d 445 (1961) ; *Cummings v. State*, 223 Md. 606, 611, 165 A. 2d 886 (1960), *cert. den.*, 366 U. S. 922 (1961), to cite but a few. In the context in which "fairly" is used in *Williams* and the cases above cited, it can only be synonymous with "rightfully," "properly," "justifiably" or "impartially" and does not in any significant way alter the criterion expressed in *Royal, supra.*

In order to prove first degree murder, the State must have shown that the killing was wilful, deliberate, and premeditated.

> " 'Premeditated' means that the killing must have been meditated, planned in the mind, beforehand; that the design to kill must have preceded the killing by an appreciable length of time, time enough to deliberate; and in order to

justify a conviction of first degree murder, the trier of facts must find the actual intent (wilfulness), the fully formed purpose to kill (deliberation), with enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper (lack of deliberation and premeditation), but that the mind has become fully conscious of its own design. Although the design to kill must precede the killing by some appreciable length of time, that time need not be long. If the killing be not the instant effect of impulse, if there be hesitation or doubt to overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." *Hyde v. State,* 228 Md. 209, 215-216, 179 A. 2d 421 (1962).

Applying the test set forth in *Williams* to the evidence outlined in this opinion, the jury could honestly and justifiably have been convinced beyond a reasonable doubt that the appellant, in firing the final shot (if not the first three), was guilty of the wilful, deliberate, and premeditated murder of Walter "Kidd" Henderson. Although the design to kill must precede the killing by some appreciable length of time, that interval need not be lengthy. If the killing stems from a "choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." *Chisley, supra,* at 106-107, quoting from *Leighton v. People,* 88 N. Y. 117, 120. The firing of just two shots separated by an interval of time has been held by this Court to be sufficient evidence of deliberation and premeditation. *Chisley, supra,* at 108.

The appellant has consistently and forcefully maintained that he acted in self-defense. However, the jury is

under no obligation to believe his version of the events, any more than they were obliged to believe the version of the prosecution witnesses. *Willis v. State,* 2 Md. App. 662, 665, 236 A. 2d 430 (1968).[3] The issues of premeditation and self-defense, as well as the credibility of all witnesses who testified, were clearly matters for the jury to decide. As long as there was legally sufficient evidence by which the jury could fairly be convinced of the defendant's guilt beyond a reasonable doubt, its verdict will not be disturbed on appeal.

## III. DENIAL OF APPELLANT'S *MIRANDA* RIGHTS

The appellant next contends that he was denied procedural due process in that his rights as set forth in *Miranda v. Arizona,* 384 U. S. 436, 467-479, 86 S. Ct. 1602 (1966) were violated. Specifically, he alleges that he was first interrogated after only a "partial Miranda admonition," that no written statements were ever taken, and no "specific, customary waiver of counsel form" was signed by him.

There was no objection made at trial to the admission of the two oral statements, and it would appear that the question is not properly before this Court for appellate review. Maryland Rule 885. However, for the same reasons that we have entered into a rather detailed discussion of the case thus far, we shall also discuss the allegations made in this regard.

The trial court, apparently *sua sponte,* conducted a preliminary hearing in order to determine the voluntary nature of the statements given to the police. During this preliminary hearing, and again later in the presence of

---

3. Counsel for the appellant contend that Willis v. State and other cases with similar holdings create "a presumption that prosecution witnesses are to be believed," which "vitiates the necessity for trial at all." Not so. That is neither the holding nor the effect of the cases in question. Such cases are merely stating that a jury is not bound to believe the testimony of a defendant simply because he is a defendant. Rather, they are to judge the credibility of his testimony and weigh that testimony as they would that of any other witness.

the jury, Sgt. Christian testified that the appellant was fully advised of his rights prior to each interrogation, that the rights were read to him from a pre-printed form used by the Baltimore City Police Department, that as each individual right was read to him, the appellant was asked if he understood that particular right, and he indicated that he did, that the appellant signified that he understood *in toto* what his rights were on each occasion and signed a form signifying that was so on the occasion of the second questioning session. The appellant never contradicted any of this testimony, nor did he ever contend, prior to this appeal, that he did not understand what his rights were or that they were not fully explained to him. Indeed, he has never alleged, even in this appeal, that his statements to the police were anything other than voluntary. The only dispute that he had at trial was with the contents of the statements. From the circumstances attendant to this case, it is difficult for this Court to see in what way there existed anything but a knowing, intelligent, and effective waiver by the appellant of his Fifth and Sixth Amendments rights. The State has met its burden. *Miller v. State,* 251 Md. 362, 378, 247 A. 2d 530 (1968) ; *Mullaney v. State,* 5 Md. App. 248, 262-263, 246 A. 2d 291 (1968). See also the discussion in *State v. Fowler,* 259 Md. 95, 103-104, 267 A. 2d 228 (1970).

## IV. DENIAL OF FULL APPELLATE REVIEW

Counsel for the appellant also contend that he has been denied full appellate review of his conviction because the opening statements and closing argument of counsel, as well as the arguments made in the motion for new trial, were not recorded by the Court Reporter, at the trial court's suggestion and with the agreement of counsel for both sides. Identical grounds have been argued before the Court of Special Appeals on many occasions to no avail. In the absence of possible special circumstances not present in the case at bar, there is no reason for this Court to do anything other than adopt the reasoning of those cases. *Hall v. State,* 6 Md. App. 356, 359,

251 A. 2d 219 (1969); *Jacobs v. State*, 6 Md. App. 238, 241, 251 A. 2d 33 (1969); *Wilkins v. State*, 5 Md. App. 8, 16-17, 245 A. 2d 80 (1968).[4]

## V. TRIAL JUDGE'S DUTY TO DECLARE MISTRIAL

As part of its case, the defense called Mr. Fred Grant, the prosecutor of the case, as its witness. In response to questions from defense counsel, Mr. Grant testified that his life had been threatened during the course of the investigation, that information which he had received from informants indicated that the appellant was Henderson's "number one lieutenant," and he further volunteered the opinion that Henderson's murder had been "an assassination." This latter statement was objected to by defense counsel and was eventually stricken by Judge Carter. The appellant urges that Judge Carter should have also declared a mistrial of his own volition, and his failure to do so constitutes reversible error.

The argument that a mistrial should be declared when inadmissible evidence is brought out in response to questions by counsel has arisen in innumerable cases. What is unique in this case is that the testimony was volunteered by the prosecutor, testifying as a witness for the defense, in (non-) response to a question propounded by counsel for the defense. We have been unable to locate any case quite like it in our research of the subject. Nevertheless, there are somewhat analogous situations present in other cases.

In instances where a police officer-witness has gone beyond the scope of the question asked, the ruling has been consistently made that the determination of whether or not a mistrial should be granted ordinarily lies within the discretion of the trial court. In cases where the trial court has admonished the jury to disregard the testimony

---

4. In addition to appellant's counsel agreeing that opening statements and closing arguments need not be transcribed, there is nothing in the record to indicate that objections were taken to any remarks of the prosecutor in the opening statement or closing argument.

it has been just as consistently held that the trial court has not abused its discretion in refusing to grant a motion for a mistrial. *Gerstein v. State,* 10 Md. App. 322, 329, 270 A. 2d 331 (1970) ; *Watts v. State,* 3 Md. App. 454, 460, 240 A. 2d 317 (1968).

In the case at bar we have something more than a police officer going beyond the scope of the question put to him. Here, the prosecutor was testifying as a defense witness and stated a matter of opinion. Because of the unique posture in which he found himself, his situation is somewhat akin to a prosecutor who is making his argument to a jury at the close of a case, and it may be helpful to evaluate his testimony in that light. The primary error asserted by the appellant stems from the following answer given by Mr. Grant to a question asked by counsel for the defendant:

> "Q. You had reason to believe that Mr. Wilson [appellant] would be murdered, didn't you?
> "A. Yes, I had reason to believe that, along with many other people because I believe this was an assassination."

It is well settled law in this State that prosecutors who refer to matters which are not in evidence during their arguments to the jury are acting improperly. *Toomer v. State,* 112 Md. 285, 292-293, 76 A. 118 (1910) ; *Reidy v. State,* 8 Md. App. 169, 172, 259 A. 2d 66 (1969). There is, of course, no difference when the prosecutor steps up from the trial table to the witness stand to make his comments. It is difficult to understand why the prosecutor would needlessly jeopardize the outcome of a trial by responding in the manner that he did. There had not been any attempt by the State to establish that the murder was an "assassination," and it would not appear that any legitimate purpose was to be served by the answer. It is a practice which is not to be encouraged in the slightest if the courts are to insure a fair and impartial trial for persons accused of crime, and the answer in this case may

well have been prejudicial had it gone unnoticed or unchallenged.

However, after objection by counsel for the defense, the trial judge ultimately instructed the jury to disregard that portion of the testimony, and it is presumed that the jury was capable of following the instructions of the judge in such matters. *Bruton v. United States,* 391 U. S. 123, 135, 88 S. Ct. 1620 (1968). In the absence of anything in the record clearly indicating that the appellant was prejudiced by the answer of the Assistant State's Attorney, it would appear that the admonition of the court achieved the desired effect and adequately protected the right of the appellant to a fair trial. Even in cases where a motion for a mistrial is made, the discretion of the trial court is not disturbed on appeal, except in the most plain and obvious instances of abuse. *Veney v. State,* 251 Md. 159, 181, 246 A. 2d 608 (1968), *cert. den.,* 394 U. S. 948 (1969); *Smith v. State,* 169 Md. 474, 182 A. 287 (1936); *Hurley v. State,* 6 Md. App. 348, 355, 251 A. 2d 241 (1969); *Baldwin v. State,* 5 Md. App. 22, 30, 245 A. 2d 98 (1968). *Cf. Contee v. State,* 223 Md. 575, 583-584, 165 A. 2d 889 (1960). If the trial court is given such discretion in ruling on a motion made to it for a mistrial, its latitude is even greater in deciding whether or not to declare a mistrial *sua sponte.* In the case at bar, the actions of the trial court did not constitute an abuse of discretion.

## VI. ASSISTANCE OF COUNSEL

Appellant presents a twofold argument in this respect. His first argument is that he was not represented by counsel of his own choice at trial. The same argument was presented at the hearing on the appellant's motion for a new trial, and it is essentially that he retained Manuel Lefko, Esq., a member of the Maryland bar who had represented him in a prior difficulty, and was represented instead by Sheldon Rubenstein, Esq. (a member of the Maryland bar who shared office space with Mr. Lefko), contrary to his wishes. These contentions were

covered quite thoroughly at the hearing on the motion for a new trial, and testimony was given by the appellant, his sister who paid the attorney fees, Mr. Lefko, and Mr. Rubenstein.

A review of the record indicates that the appellant was represented at his arraignment by Mr. Rubenstein, who filed the suggestion of removal as counsel for the appellant. Mr. Rubenstein visited and discussed the case privately with the appellant on at least eight occasions prior to trial, and twice more in the company of Mr. Lefko. Appellant's sister paid at least part of the fee to Mr. Rubenstein directly. The appellant testified that he thought that Mr. Rubenstein was merely Mr. Lefko's "leg man," but this was contradicted by both attorneys who stated that all the facts had been explained fully to the appellant and his sister. The appellant made no objection at trial to his being represented by Mr. Rubenstein.

The case is therefore factually quite different from *English v. State*, 8 Md. App. 330, 259 A. 2d 822 (1969), relied on by the appellant. In *English* the defendant requested a postponement of his case in open court because he had retained the father of the attorney who appeared to defend him. It was admitted by the younger Mr. Kaplan in *English* that it was his father's case, but he stated that he was familiar with the case and was then allowed by the trial court to proceed. Under such circumstances, the Court of Special Appeals ruled that the appellant had been denied representation by counsel of his own choice.

On the record before us, Judge Carter understandably found that the appellant had agreed to waive his original request for Mr. Lefko, who had advised him that he was too busy to take his case, and accepted the representation of Mr. Rubenstein in his place. See *English v. State, supra,* at 336.

Appellant's second argument is that he was denied effective assistance of counsel. The courts of this State have many times in the past ruled that such allegations will not be heard on direct appeal because, among other things, such a procedure affords no opportunity to the at-

torney to explain or defend his actions during the trial of the case. *Boswell v. State,* 5 Md. App. 571, 583, 249 A. 2d 490 (1968). Nevertheless, the appellant contends that his hearing on the motion for a new trial "was in the nature of a post conviction hearing with counsel testifying against the allegations" and that this Court should therefore carve out an exception to the general rule. While it is true that in *Bartholomey v. State,* 260 Md. 504, 513, 533, 273 A. 2d 164 (1971), we did consider and discuss the question of competency of counsel even though it had not been raised below, yet, in the instant case we find nothing in the record which would justify this Court in deviating from the rule that such an issue is properly a matter for post conviction relief should the accused so elect, and we state this without prejudice to the appellant to raise such an issue by way of post conviction procedure. We are also mindful of Judge DeWeese Carter's observation that the appellant's defense counsel rendered an "alert and vigorous defense."

The testimony at the hearing on the motion for a new trial concerned only the question of which attorney the appellant thought was representing him, and had nothing to do with the nature of the defense offered on behalf of the accused at trial. For the reasons set forth in *Boswell* and its progeny, we therefore decline to make any determination in this opinion concerning the adequacy of trial counsel. Accordingly, no useful purpose would be served by further enumerating the appellant's allegations in this regard.

*Judgment affirmed.*