600 A.2d 420

Shawn **WOODSON**

v.

**STATE of Maryland.**

No. 61, Sept. Term, 1990.

Court of Appeals of Maryland.

Jan. 24, 1992.

Nancy S. Forster, Asst. Public Defender and Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, all on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, JJ., and EDWARD A. DeWATERS, Jr., Administrative Judge of the Third Judicial Circuit of Md., specially assigned.

MURPHY, Chief Judge.

Officer William J. Martin of the Baltimore City Police Department was shot to death in the early morning hours of October 10, 1989 while responding to an anonymous call reporting drug use in the stairwell of an apartment building

at 1502 Pennsylvania Avenue. A second officer, Herman Brooks, was shot and wounded during the incident.

Shawn Woodson was arrested at the scene. He was subsequently indicted for the first degree murder of Officer Martin, the attempted murder of Officer Brooks, and related offenses. The State filed notice of its intention to seek the death penalty for the murder of Officer Martin.

At the trial before a jury in the Circuit Court for Baltimore City, Woodson was found guilty of first-degree murder, attempted second-degree murder, two counts of use of a handgun in the commission of a crime of violence, and two counts of carrying a handgun. After Woodson waived his right to be sentenced by the jury, the court (Mitchell, J.) sentenced Woodson to death for the first-degree murder of Officer Martin. The court also imposed consecutive sentences of thirty years for the attempted second-degree murder of Officer Brooks, and twenty years for each count of use of a handgun in the commission of a crime of violence. The case is now before us, pursuant to Woodson's notice of appeal. *See* Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 414 and Maryland Rule 8–306(c).

I.

According to testimony adduced at the trial, Woodson, in company with Tyrone McQueen, Taavon Hall, Dale Truly, and Shawn Hawkins, purchased some heroin in the early morning hours of October 10, 1989, after which they drove to the apartment house at 1502 Pennsylvania Avenue where Truly and his girlfriend resided. The men then snorted the heroin in the stairwell of the apartment building's first floor landing.

Observing lights from an approaching police vehicle, Truly and McQueen hurried down the steps and entered Truly's apartment. Hawkins also ran down the stairs, intending to leave the building. He encountered Officer Martin, as the officer was entering the building. Martin stopped and frisked Hawkins and allowed him to leave the building.

The officer then proceeded up the stairs towards the first floor landing where Woodson and Hall remained.

Officer Brooks testified that, along with Officer Robin Johnson, he went to the apartment building as a back-up unit for Officer Martin. Brooks said that he entered the building, followed by Johnson, through the rear basement door. At that time, he heard a shot, a pause, and then two more shots. He observed Hall run out the front door, while Woodson ran down the stairs toward the rear door. According to Brooks, Woodson shot him in the hand, after which they exchanged gunfire. Brooks was hit again, this time in the chest area of his bulletproof vest, and he was knocked down. Woodson was struck in the groin area and continued toward the rear door where he encountered Officer Johnson. Woodson tripped over Johnson's foot and fell to the ground. Officer Johnson straddled Woodson, held him at gunpoint and, with assistance from other officers, handcuffed him. A handgun was recovered near the rear door.

Officers Seibert and Pedrick, who also responded to the scene, heard gunshots as they arrived at the building. Seibert said there was "one distinct gunshot" followed by a "couple of more shots and then a few more shots." Seibert testified that after the first gunshot, he observed Hall run from the apartment door. Pedrick said that he heard a "loud bang" and then a "volley of gunshots," after which Hall ran from the front door.

Pedrick found Officer Martin lying in a pool of blood on the first floor landing. His service revolver was snapped closed inside his holster and had not been fired. There was evidence that Officer Martin died as a result of two gunshot wounds to the head. No usable fingerprints were found on the handgun recovered by the police at the rear door entrance to the building through which Woodson attempted to flee. There was evidence, however, that the bullets removed from Officer Brooks's vest, and those taken from Officer Martin's head, came from this handgun. Swabs taken from Woodson's hands after his apprehension re-

vealed residue of barium and antimony, indicating that he was in close proximity to a firearm when it was discharged.

Andre Spells testified as a State's witness that he was in a cell at the Baltimore City Jail when, on October 23, 1989, a man who identified himself as Shawn Woodson confessed to him that he had shot and killed Officer Martin. Woodson did not testify and called no witnesses.

## II.

Woodson argues that the trial court erred in allowing Andre Spells to testify concerning admissions allegedly made to Spells by his cellmate in the Baltimore City Jail on October 23, 1989. Spells testified that his cellmate was known to him as Shawn Woodson.[1] Specifically, Spells testified as follows:

"STATE'S ATTORNEY: After your first cell mate left, was anybody else brought to your cell?

A. Yes, Mr. Woodson.

Q. Do you know his first name?

A. Shawn

Q. And is Mr. Woodson in the courtroom today?

A. I don't see him.

Q. Look all the way around?

A. I don't see him.

Q. Have you turned around and looked at everybody? If you wish to stand up and walk around the courtroom you may, sir. Please look at all the faces in the courtroom.

A. I don't recognize him, no.

Q. You don't recognize him at all. This Mr. Woodson that you spoke to, Mr. Woodson that was put in your cell with you, how long was he in there with you?

A. One day, two nights.

---

1. Spells testified at Woodson's trial on May 8, 1990, approximately six and a half months later.

Q.  One day and two nights.  During the time that he was there with you, did you have any conversations with him?

DEFENSE COUNSEL:  Objection, if Your Honor please.

THE COURT:  Overruled.

A.  ˙Oh, yes.  We talked.

DEFENSE COUNSEL:  Objection.  It's not responsive.

THE COURT:  That's it.  Overruled.

DEFENSE COUNSEL:  May we approach the bench?

THE COURT:  No.

STATE'S ATTORNEY:  Now, the person that you know that was brought to your cell ... was brought in under the name of Shawn Woodson, had you ever met him before?

A.  No.

Q.  You said you spent two nights and one day there?

A.  That's correct.

Q.  And had you seen him since then?

A.  No.

Q.  And at the time that you spoke to him, did you know where he had been previous to coming to your section?

DEFENSE COUNSEL:  Objection, Your Honor.

A.  No.

THE COURT:  Overruled.  Overrule the objection.

STATE'S ATTORNEY:  ... When you spoke to Mr. Woodson, did you speak—

DEFENSE COUNSEL:  Objection, Your Honor.

THE COURT:  Approach the bench please.

(Whereupon, counsel and the Defendant approached the bench and the following conference ensued:)

THE COURT:  What is the problem, Mr. Zerwitz?

DEFENSE COUNSEL:  Your Honor, I don't know who this individual is that this witness spoke to.  First of all, he couldn't identify Mr. Woodson.  She just asked him when you spoke to Mr. Woodson, presupposing that it's

Mr. Woodson. That is an improper question to begin with. It leads to a false conclusion.

THE COURT: It absolutely is not, Mr. Zerwitz. The testimony of this witness was that he spoke with Shawn Woodson.... He can't identify the face but he gave the name. Now, she [the State's Attorney] ... is permitted to use the name that he gave in testimony.

DEFENSE COUNSEL: Well, then, if Your Honor please, let her at least ask him the person who identified himself as Shawn Woodson.

THE COURT: I don't think that's necessary. She said when you spoke to Mr. Woodson. That's the name he gave. That's the name she is entitled to use. Overruled.

. . . . .

DEFENSE COUNSEL: ... I'm going to object to any statements that this person in this cell may have made to this person, which is clearly outside of the presence of this Defendant. That's a hearsay statement.

THE COURT: Why is it outside of his presence?

DEFENSE COUNSEL: Because he wasn't there according to this man.

THE COURT: That's not what this man has said.... The testimony of this man is he spoke to a Shawn Woodson. The fact that he cannot identify him in Court does not obviate or vitiate his statement. It doesn't mean that you have to qualify it. It's up to the trier of fact to decide if there is any validity to it or if it is credible....

(Whereupon, counsel returned to the trial table and proceedings resumed in open court.)

. . . . .

STATE'S ATTORNEY: Did the individual, Shawn Woodson, tell you where he had come from or what he was in Baltimore City Jail for?

. . . . .

A. —the first night he spoke vaguely about why he was there in the case and the second night we was there we spoke about it and I asked him a couple of questions.

Q. Before we go into that, did you get a chance to observe the physical condition of Shawn Woodson?

A. Yes.

Q. What, if anything, did you observe?

. . . . .

A. The way he presented himself you can tell he was hurt, injured.

. . . . .

Q. Where?

A. Somewhere in the mid body.

Q. And did you learn of any nickname for him, what he was called?

A. Yes, Buddy.

Q. Now, you mentioned that he spoke vaguely to you on the first night. What did he speak about vaguely?

A. Well, he didn't speak directly to me. He mentioned to other people in the cell area, you know, about why he was there.

Q. Did he say why he was there?

A. Yeah, in reference to the slain officer.

. . . . .

Q. In relation to what?

A. The slain officer, Martin.

Q. Did there come a time that you asked him any questions?

A. Yes. The second night we was there.

Q. What, if anything, did you ask him?

A. ... I asked him about the gun he used. I said you must have had a pretty large gun— ... to have killed the police because I know they wear vests....

Q. What did he say when you said he had ... to have a pretty large gun to kill the police?

A. He went on to say it don't make a difference because if you want to kill someone you shoot them in the head and it wouldn't have made a difference anyway because if I had shot him in the chest, even with a bullet

proof vest, the pressure would have, the impact from the bullet would have rushed to that point and it would like exploded or something of that nature.

Q. Did he describe his gun to you?

A. I believe he said it was a chrome or nickel plated gun and it was a .380.

Q. Did he say anything to you about guns?

A. Yeah. Well, he had a fascination with guns and he specifically said he was—he like automatics, semi automatics.

. . . . .

Q. Did he tell you anything about the incident itself?

A. Yeah, He just basically said, well, it happened in some kind of hallway and when the police came up it was either him or the police and he had got the drop on him so he shot him."

In arguing that Spells's testimony should not have been admitted, Woodson emphasizes that while he was in the courtroom during Spells's testimony, Spells said that the man who confessed to him was not present in the courtroom. Woodson points out that prior to Spells's testimony, three witnesses identified him as being seated at the trial table. He thus maintains that, other than Spells's testimony that the man who confessed to him was named Shawn Woodson, there was no evidence which linked him either to Spells or to the alleged confession. According to Woodson, the only reasonable inference from Spells's repeated testimony that he did not see the cellmate who identified himself as Shawn Woodson in the courtroom was that the cellmate was not Woodson. He argues further that Spells's correct reference to his nickname of "Buddy," and that he had a mid-body injury, was brought out after the trial judge had indicated that Woodson's mere name alone would support admissibility of the statement. Thus, Woodson says that these details did not add sufficient identification evidence to support admissibility of the alleged confession as having been made by him. As to this, Woodson suggests that

these details could have been obtained by anyone who listened to the news accounts of Officer Martin's murder. Furthermore, Woodson draws attention to inaccuracies in Spells's testimony. Specifically, he refers to Spells's testimony that he (Woodson) had stated that "he was by hisself" during the shooting and that his "rap buddy was out front," whereas the testimony appeared to establish that both he and Hall were on the landing when Officer Martin was shot. Woodson also points to Spells's testimony that he (Woodson) had told Spells that his father "taught him how to shoot" and his father "got killed" when the evidence showed that his father died of brain cancer when Woodson was eight years old; and to Spells's testimony that Woodson told him that he was not apprehended at the scene of the crime when the evidence at trial was to the contrary. According to Woodson, these inaccurate details significantly weighed against any conclusion that a confession was ever made by him to Spells.

Woodson next invites attention to the fact that the State adduced no evidence, other than Spells's testimony, that he and Spells were ever cellmates. He contends that the lack of sufficient proof that he was the person who spoke to Spells required the trial judge to exclude Spells's testimony from the jury's consideration.

The State claims that the inability of Spells to identify Woodson in the courtroom was a matter going solely to the weight, rather than the admissibility, of the evidence. It argues that at no time did Spells say that the Woodson seated at the trial table was not the man who confessed to him; rather, the State maintains that Spells simply professed an inability to recognize the declarant which, in itself, is not sufficient to undermine the link to Woodson through his name and physical condition.

### III.

Before an admission of guilt may be received in evidence, there must be satisfactory proof that it was made

by the defendant. This burden, of course, rests upon the State. In determining whether the State met its burden, we consider whether, in the circumstances, including Spells's failure to identify Woodson at trial as the person who confessed to him, it was error to attribute the statement of the "Shawn Woodson" who allegedly confessed to Spells as the statement of the defendant on trial.

In *York v. State,* 45 Wis.2d 550, 173 N.W.2d 693 (1970), codefendants, York and Bowie, were jointly tried and convicted of burglary. At trial, a Detective Behrendt testified concerning a confession given to him by Bowie but he was unable to identify Bowie. Another detective, however, was able to identify Bowie as the same individual he had observed Detective Behrendt interview. Bowie contended that the confession should not have been admitted because there was no showing that the person who confessed and the person who was on trial were the same individual. The Supreme Court of Wisconsin, in affirming the conviction, concluded that there was ample evidence in the record to establish that the defendant on trial and the individual who confessed were one and the same. It stated:

> "Detective Behrendt testified that he had questioned a person identified to him as Earl David Bowie in the interrogation room of the detectives' assembly at 10 a.m. on March 22, 1968, and had obtained a confession from him. Detective Cornell, although he did not testify to hearing defendant Bowie confess to Detective Behrendt, did testify that he had seen Detective Behrendt questioning defendant Bowie at the detective bureau on March 22, 1968, at about 10 a.m."

*Id.* 173 N.W.2d at 698–99.

In *Fischer v. State,* 172 Tex.Cr. 592, 361 S.W.2d 395 (1962), the defendant complained that his confession should not have been admitted into evidence over his objection because the police officer who testified concerning it was unable to identify him at trial as the one who made it. In rejecting this contention, the court pointed to evidence that it was the defendant who was taken to the officer's office

on the night of the arrest. It held that this was sufficient evidence to show that it was, in fact, the defendant who gave the written confession to the officer. To like effect, *see also State v. Scriver*, 20 Wash.App. 388, 580 P.2d 265 (1978).

■ In contrast to these cases, no corroborative evidence was adduced by the State in the present case that the person on trial, whom Spells was unable to identify as the speaker, had been a cellmate of Spells in the Baltimore City jail on October 22 and 23, 1989. There was no evidence that Woodson and Spells were ever together in the jail. The State's failure to produce any evidence from jail records or from guards or others who may have seen the two men together in the jail may have been due to the trial court's expressed belief, as shown by its heretofore recited colloquy with defense counsel, that Spells's identification of Woodson by name alone sufficed, without more, to render Woodson's purported confession admissible in evidence. This was so, the court stated, even though Spells could not identify Woodson seated before him in the court room as the man who confessed to murdering Officer Martin.

It was against this background of the trial court's announced intention to admit Woodson's confession in evidence that the prosecution may have decided not to produce additional identification evidence linking Woodson and Spells together (other than that Spells knew that Woodson's nickname was "Buddy" and that he had a mid-body injury).

In this capital prosecution, Spells's testimony concerning Woodson's confession, if admitted and believed, established that it was Woodson, and not Hall, who murdered Officer Martin, thereby making Woodson a principal in the first degree and eligible for the imposition of the death penalty for murdering a police officer in the performance of his official duties. In these circumstances, we think an evidentiary foundation beyond Spells's knowledge of Woodson's name was essential to show a linkage between the two men and the purported confession. As we see it, the net effect

of Spells's testimony was that a man who identified himself as Shawn Woodson confessed to killing the officer, but that Spells did not recognize that person as the defendant seated immediately before him at the trial table. That Spells knew that Woodson's nickname was "Buddy," and that he had a mid-body injury, does little, in our view, to bolster Spells's name identification of Woodson as the person who confessed to him. To admit such evidence on such an inadequate evidentiary foundation would be, for example, to sanction the testimony of any witness who, without more, claims that a voice on the telephone, which he cannot recognize as the defendant's, identified himself using the name of the defendant, and confessed to the crime.

We note, in a somewhat related vein, that one text authority has indicated that in criminal cases involving enhanced punishment of a defendant because of a prior conviction, there is a presumption of identification of a person based upon identity of names. *See* 1 *Wharton's Criminal Evidence* § 103 (C. Torcia 13th ed. 1972), which states:

> "Identical names give rise to a presumption of identity of person. This presumption is slight when the name is common and there are many persons having the same name. It increases in strength with circumstances indicating the improbability of there being two persons of the same name at the same time and place, and where there is no evidence that there is any other person bearing that name. Identity, then, can be presumed from names coupled with other circumstances. There is some case law to the effect that the identity of names alone gives rise to a rebuttable presumption of identity of person."

In this connection, we quoted this section as authority in *Bowers v. State,* 298 Md. 115, 130–31, 468 A.2d 101 (1983). *See also* 9 *Wigmore on Evidence,* § 2529 (3rd ed. 1940); *Robertson v. Warden,* 212 Md. 646, 129 A.2d 90 (1957) (prior conviction must be proved by documentary evidence); *Maguire v. State,* 47 Md. 485 (1878) (evidence must be

produced of prior conviction to show identity of the person on trial with the person described in the indictment).

■ Assuming, arguendo, that the use of Woodson's name alone would raise a rebuttable presumption of identity, the presumption was nullified when Spells testified that the person who confessed to him was not in the courtroom. The conversation Spells had with his cellmate was inadmissible hearsay unless and until it was established to be an admission made by the defendant. Manifestly, the State must make a prima facie showing that the cellmate was the defendant, a threshold finding that is absent in this case. In this regard, the trial judge was required to do more than simply admit the alleged cellmate's statements solely because the cellmate was known to Spells as Shawn Woodson. Admitting the statement solely because the speaker was identified as Shawn Woodson after Spells had indicated that the speaker was not in the courtroom was reversible error requiring that we remand the case for a new trial on the charge of murder in the first degree of Officer Martin.[2]

## IV.

While we need not decide other issues presented by Woodson on his appeal, we nevertheless think it advisable to comment on two matters of particular importance.

One of Woodson's arguments for reversal of his first degree murder conviction was that the prosecutor improperly commented on his failure to testify or present evidence during the State's rebuttal argument. This argument, of course, implicates Woodson's constitutional right to free-

---

2. We note from the evidence at the trial that Spells was being held on theft charges when he phoned the police and said that he had information concerning the murder of Officer Martin. By his own admission, Spells wanted to cooperate with the police to gain some benefit for himself. He admitted that he asked Woodson questions because "I thought maybe it could help me somewhere along the line." According to his testimony, Spells was convicted of theft charges on November 7, 1989, and released from jail on probation, one week later, on November 15, 1989.

dom from compelled self-incrimination which is enshrined in the fifth amendment to the federal constitution and in Article 22 of the Maryland Declaration of Rights. The right is also protected by Maryland Code (1989 Repl.Vol.) § 9–107 of the Courts and Judicial Proceedings Article.

In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that the constitutional right against compelled self-incrimination forbids prosecutorial comment on a defendant's failure to testify at a criminal trial. Well before *Griffin*, our cases prohibited this practice, see *Barber v. State*, 191 Md. 555, 62 A.2d 616 (1948); *King v. State*, 190 Md. 361, 58 A.2d 663 (1948); *Smith v. State*, 169 Md. 474, 182 A. 287 (1936). Our cases subsequent to *Griffin* have also so held. *See Eley v. State*, 288 Md. 548, 555 n. 2, 419 A.2d 384 (1980); *Veney v. State*, 251 Md. 159, 179, 246 A.2d 608 (1968). In *Wilson v. State*, 261 Md. 551, 569, 276 A.2d 214 (1971), we expressed difficulty in understanding why a prosecutor would jeopardize the outcome of a trial by referring to a defendant's failure to testify at a criminal trial.

In the present case, Woodson moved for a mistrial after the prosecutor's closing rebuttal argument. He claimed that the prosecutor, before the jury, improperly commented on his failure to testify in his own defense. According to the record, the prosecutor, while pounding on the witness stand, pointed to the defense trial table and said, "they have sat there for 6 days, not here." Upon Woodson's objection, the prosecutor told the court that he was "sorry." He continued, saying, "they have tried to baffle you with bologna from that trial table and from in front of here today and ... that is not evidence.... [W]e gave you evidence and we kept our promise." Thereafter, defense counsel requested a bench conference. Before he could object again, the trial judge said, "I know [defense counsel] is prepared to make motions for mistrial on the basis that the State in his view allegedly referred to the fact [that the] defendant did not, A, testify, or, B, did not produce evidence to show that he was innocent." Woodson's counsel inter-

jected at this point, emphasizing that the prosecutor "slammed his fist on the witness stand, more than one time."

The court then gave its view of the occurrence. It said that, in the context in which the prosecutor's closing argument was made, it was "a reference to the attack, rightfully done, upon the capacity and believability of the witnesses presented by the State." The court next said that it would instruct the jury on the "responsibilities of the defendant, which are none in this case." It then gave a full curative instruction to the jury.

After the trial, the court was presented with a motion for a new trial, based in part on the allegedly improper prosecutorial comment on Woodson's failure to testify. In further clarifying its reasons for denying Woodson's motion for mistrial, the court first acknowledged that the prosecutor, while standing before the jury in closing rebuttal argument, "pounded on the witness stand" and said that "they have not sat here." The court stated that the prosecutor's actions came after he had castigated defense counsel for "raking" the State's expert witness "over the coals" in an effort to demonstrate his incompetence to the jury. The court believed that it was the prosecutor's intention "to show to the jury that the expert witness had done all that [he] possibly could to come to a reasonable and rational conclusion." Having said this, the court expressed the view that the prosecutor's argument did not refer "to the silence of the defendant during the trial" or make any reference to "whether the defendant did or did not call a witness to the stand." Rather, the court explained that the prosecutor's argument, taken in context, reminded the jury "that it's easy to question critically a witness but it's more difficult to be the one under examination." Its interpretation, the court said, was "instantaneous" with the prosecutor's comment and that "in a naked sense you could perhaps suggest that the State may have crossed the boundary of its rhetoric." The court concluded, however, that the State did not violate the rule that it may not "make any comments on the

exercise of the right by the defendant in the course of the trial [to comment on Woodson's failure to testify]." In denying the new trial motion, the court said that its curative jury instruction reminded the jury of its responsibility to judge the case on the evidence and not to draw any inference from the defendant's silence.

Notwithstanding the trial court's careful consideration of Woodson's motions for a mistrial and for a new trial, it is plain that the only person at the defense trial table who could have sat in the witness stand was Woodson himself, and that the prosecutorial comment therefore invited attention to the fact that Woodson did not testify. By pointing out to the jury that the prosecution "gave you evidence," and that Woodson did not, the jury may well have gleaned from that sharp contrast that it might infer guilt from Woodson's silence.

Because we have no need here to pass upon the matter, we do not decide whether, if the prosecutorial comment did run afoul of the constitutional protection against self-incrimination, the court's instructions to the jury adequately "cured" the alleged improper prosecutorial remarks. *See Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976); *Veney v. State, supra,* 251 Md. at 180–82, 246 A.2d 608.

## V.

■ Finally, we again focus on the burden of proof in weighing aggravating and mitigating circumstances in the determination of whether, under Code, Article 27, § 413(h), the death sentence may be imposed.

At the nonjury sentencing hearing, the court found a single aggravating circumstance and two mitigating circumstances. It said, in imposing the death penalty, that "after reviewing the question from all angles and after balancing the mitigating factors against the aggravating factors, that the mitigating circumstances did not outweigh the aggravating circumstances."

The correct test in determining whether the death penalty may be imposed "is whether the State has proven by a preponderance that the aggravating circumstances outweigh the mitigating circumstances." *White v. State*, 322 Md. 738, 745, 589 A.2d 969 (1991). It bears repeating that it is not whether the mitigating circumstances outweigh the aggravating circumstances but whether the aggravating circumstances outweigh the mitigating circumstances. Thus, "if the aggravating circumstances do not outweigh the mitigating circumstances, or if the weight of the aggravating circumstances is equal to the weight of the mitigating circumstances, the sentence cannot be death." *Id.* at 745, 589 A.2d 969. In this regard, "the defendant does not have any burden to show that mitigating circumstances outweigh aggravating circumstances." *Id.* at 746, 589 A.2d 969. Summarizing, we said in *White* that

"stripped of any consideration of which party has a burden, and viewed solely from the perspective of weighing the various circumstances which are before the trier of fact, the requirement remains that the aggravating circumstances must outweigh the mitigating circumstances, and not vice versa."

*Id.* at 746–47, 589 A.2d 969.

AS TO CONVICTIONS UNDER INDICTMENT NO. 18931201 FOR FIRST DEGREE MURDER AND USE OF A HANDGUN IN THE COMMISSION OF A CRIME OF VIOLENCE: JUDGMENTS REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL.

AS TO CONVICTIONS UNDER INDICTMENT NO. 18931202 FOR ATTEMPTED SECOND DEGREE MURDER AND THE USE OF A HANDGUN IN THE COMMISSION OF A CRIME OF VIOLENCE: JUDGMENTS AFFIRMED.

RODOWSKY, McAULIFFE and KARWACKI, JJ., dissent.

KARWACKI, Judge, dissenting:

I respectfully dissent. In my view, the majority has departed from settled Maryland precedent in concluding that the trial judge erred in admitting the testimony of Andre Spells concerning incriminating admissions made to

him by Shawn Woodson while they shared a cell at the Baltimore City jail on October 22 and 23, 1989.

Notwithstanding that this is a criminal prosecution, indeed a capital punishment case, the standard of proof for the admissibility of evidence is one of preponderance, not proof beyond a reasonable doubt. *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144, 152 (1987); *State v. Jones*, 311 Md. 23, 33, 532 A.2d 169, 174 (1987). The preliminary fact in question, upon which relevance and therefore admissibility turns, is whether the defendant was the person who made admissions to Andre Spells on October 22 and 23, 1989. The proper test, then, is whether the evidence was sufficient to allow the jury to conclude that it was more likely than not that the defendant was the man who spoke to Spells on those occasions.

Spells's testimony that the incriminating statements were made by his cellmate who introduced himself as "Shawn Woodson," used the nickname "Buddy," and who was suffering at the time from a mid-body injury provided a sufficient basis for the admission of those oral admissions despite Spells's inability to identify Woodson at trial. *Bowers v. State*, 298 Md. 115, 468 A.2d 101 (1983) *appeal after remand*, 306 Md. 120, 507 A.2d 1072 (1986), *cert. denied*, *Bowers v. Maryland*, 479 U.S. 890, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986), *post-conviction proceeding, Bowers v. State*, 320 Md. 416, 578 A.2d 734 (1990). In *Bowers* the defendant, after his arrest, gave a statement to the police wherein he related that he and one Alexander Peterson raped the victim and thereafter Peterson strangled the victim to death. The defendant described Peterson as a fugitive who was "on the run from Chicago." At trial, over the objections of the defendant, the State introduced records showing that on the date of the offense in question an Alexander Peterson was incarcerated at the Pontiac Correctional Center in Illinois.

We rejected Bowers contention that the trial court had erred in admitting the evidence that someone named Alex-

ander Peterson was incarcerated at the time of the murder. We reasoned:

"1 *Wharton's Criminal Evidence* § 103 (C. Torcia 13th ed. 1972) states:

" 'Identical names give rise to a presumption of identity of person. This presumption is slight when the name is common and there are many persons having the same name. It increases in strength with circumstances indicating the improbability of there being two persons of the same name at the same time and place, and where there is no evidence that there is any other person bearing that name. Identity, then, can be presumed from names coupled with other circumstances. There is some case law to the effect that the identity of names alone gives rise to a rebuttable presumption of identity of person.' *Id.* at 180. This same passage was cited with approval in *Murphy v. State,* 47 Md.App. 387, 422 A.2d 1297 (1980), *cert. denied,* 289 Md. 738 (1981), and *Sallie v. State,* 24 Md.App. 468, 332 A.2d 316 (1975).

"By giving the police the name of Alexander Peterson who, Bowers said, was 'on the run from Chicago,' Bowers forced police to attempt to locate this alleged accomplice. When Peterson was located in an Illinois prison, a presumption of identity of persons arose. It then became the province of the jury to weigh the evidence in determining whether the Alexander Peterson who was located in Illinois was the same one referred to by Bowers. As stated in *Thomas v. State,* 32 Md.App. 465, 477, 361 A.2d 138 (1976), '[I]t is for the jury to pick and sift, to stress and ignore, to believe and disbelieve, to weigh and assess, and resolve the conflicts in reaching a final decision to acquit or convict.' The surname of the alleged accomplice was not as common as Brown, Johnson, Jones, or Smith, nor was the given name as common as Charles, Henry, John, or William. The evidence was admissible. The jury simply chose to believe the State's contention that the Alexander Peterson to whom Bowers referred was not involved in the commission of the crime in the

case at bar. Bowers was not denied the opportunity to offer contrary evidence to disprove the State's assertion or to argue in closing that the Alexander Peterson presented by the State was not the same Alexander Peterson to whom Bowers referred."

*Id.* 298 Md. at 130–31, 468 A.2d at 109.

The Court of Special Appeals applied the same principle in *Murphy, supra,* 47 Md.App. at 389, 422 A.2d at 1297–98, *cert. denied,* 289 Md. 738 (1981) (evidence of Motor Vehicle Administration driving record in name of Raymond Arvil Murphy was sufficient to convict Raymond Arvil Murphy charged with driving an automobile while his license was suspended or revoked), and in *Sallie, supra,* 24 Md.App. at 482, 332 A.2d at 324 (where eye witnesses at trial identified criminal agent only by nickname, evidence from other witnesses that defendant on trial was person known to use that nickname was sufficient to establish his criminal agency).

In the instant case, the given name and surname of Shawn Woodson hardly can be considered common. That fact coupled with the evidence that Spells knew Woodson's nickname and observed the mid-body injury he had suffered in the incident on October 10, 1989, provided ample circumstantial support for the admission of his extra-judicial identification of Woodson as the declarant of the incriminating admissions.[1]

Moreover, the permissible inference from that extra-judicial identification was not dissipated by the inability of Spells to identify Woodson at trial. Rather, it was for the jury to determine the weight to be accorded that inference in light of Spells's inability (or unwillingness) to identify Woodson at trial. *Cf. Bedford v. State,* 293 Md. 172, 443

---

1. The defense was aware through discovery proceedings of Woodson's alleged admissions to Spells as early as January 26, 1990, when Woodson moved to suppress those statements on the ground that Spells was acting as a State agent while he shared a cell with Woodson at Baltimore City jail. After hearing testimony from Detective Vernon Holly, the principal investigating officer for the Baltimore City Police Department, and from Spells, the court denied that motion.

A.2d 78 (1982) (extra-judicial identification of defendant by victims from photographic array was sufficient evidence of criminal agency notwithstanding inability of victims to identify defendant at trial); See also Lynn McLain, *Maryland Evidence*, § 303.4 n. 18 at 253 (1987).

Judges RODOWSKY and McAULIFFE have authorized me to state that they join in the views expressed herein.