*Miguel A. Fuentes v. State of Maryland*, No. 64, September Term, 2016. Opinion by Hotten, J.

**CRIMINAL LAW — CONDITION OR STATUS OF THE VICTIM**: Court of Appeals held that evidence of a medical diagnosis is not required to establish a victim's status as a "mentally defective individual" as defined by Md. Code Ann., Criminal Law (2002, 2012 Repl. Vol.) ("Crim. Law") § 3-301(b). The plain language of the statute does not support a determination that a medical diagnosis is required to prove the status of the victim. Further, the statutes at hand, Crim. Law §§ 3-301(b), 3-304(a)(2), and 3-307(a)(2), protect a class of vulnerable individuals, and the requirement of medical evidence would not conform with the statutes' protection. Thus, in cases such as this, a court must determine whether the evidence was sufficient on the question of whether the victim was incapable of consent. The Court determined the evidence was sufficient to support the Petitioner's convictions.

**CRIMINAL LAW — COMMENTS ON MATTERS NOT SUSTAINED BY EVIDENCE — HARMLESS ERROR ANALYSIS**: Court of Appeals determined prosecutor's closing argument which referenced Petitioner's alleged statement, which was not admitted in evidence, was improper. In the statement, Petitioner allegedly admitted to taking advantage of the victim's limited mental capacity. However, the Court determined that under these particular circumstances, given: (1) the undisputed evidence that Petitioner and the victim engaged in sexual contact and vaginal intercourse, (2) the evidence regarding the extent that the victim exhibited a mental defect, (3) the duration of the working relationship between the Petitioner and the victim, which supports the determination that Petitioner, at a minimum, reasonably should have been aware of the victim's mental defect, (4) Petitioner's failure to deny knowledge of her diminished mental capacity on cross-examination, and (5) the trial court's instruction, the trial court's overruling of the defense objection to the improper argument constituted harmless error.

**CRIMINAL LAW — EVIDENCE — RELEVANCE**: Court of Appeals determined that the trial court properly excluded, on relevance grounds, over 300 pages of the victim's employment records. The question of whether the victim was able to perform various housekeeping duties was not legally relevant to a determination of whether she was capable of "appraising the nature of the individual's conduct[]" of a sexual nature, or of "resisting vaginal intercourse, a sexual act, or sexual contact[,]" or of "communicating unwillingness to submit to vaginal intercourse, a sexual act, or sexual contact[,]" pursuant to Crim. Law § 3-301(b).

IN THE COURT OF APPEALS

OF MARYLAND

No. 64

September Term, 2016

_____

MIGUEL A. FUENTES

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.
Watts, J., joins in judgment only.
Adkins, J., dissents.

_____

Filed: July 12, 2017

A jury in the Circuit Court for Prince George's County convicted the Petitioner, Miguel Fuentes, of second-degree rape and third-degree sexual offense. The jury acquitted Fuentes of fourth-degree sexual offense and second-degree assault. The trial court sentenced Fuentes to twenty years of incarceration in the Division of Correction, with all but twelve suspended, for second-degree rape and ten years, all but one suspended, for third-degree sexual offense, to run concurrently. The Court of Special Appeals affirmed in an unreported opinion dated August 18, 2016. Thereafter, we granted Fuentes' Petition for Writ of Certiorari. *Fuentes v. State*, 450 Md. 419, 149 A.3d 546 (2016). Fuentes presents the following questions for our review:

> 1. Was the evidence legally insufficient to support Petitioner's convictions where the convictions were contingent on [the victim]'s status as a "mentally defective" individual and the State failed to present evidence that she had been diagnosed with either mental retardation or a mental disorder?
>
> 2. Where Petitioner's knowledge of [the victim]'s purported mental deficiency was a required element of both convictions, was it reversible error for the State to inform the jury at closing argument that Petitioner had admitted to taking advantage of her "mental diminished capacity" in an interview that was never admitted into evidence at trial?
>
> 3. Where [the victim]'s ability to understand the conduct of others and to communicate with others was central to the jury's determination of whether she could be considered a "mentally defective" individual, did the trial court err in refusing to allow the defense to present employment performance evaluations that assessed both of these skills during her employment which is when the sexual activity took place?

For the reasons that follow, we shall affirm the judgments of the Court of Special Appeals.

**FACTS AND LEGAL PROCEEDINGS**

The charges here stemmed from a sexual incident between Fuentes and Ms. R.,[1] a thirty-eight-year-old woman at the time of trial. The incident occurred in Prince George's County in 2012 at a Marriott hotel where both were employed. The State alleged that Ms. R. was deaf and mentally defective as defined under Md. Code Ann., Criminal Law (2002, 2012 Repl. Vol.) ("Crim. Law") § 3-301 and unable to consent to the sexual activity. Fuentes countered that Ms. R. initiated the sexual contact and fully understood what would transpire.

Ms. R.'s testimony was elicited through an American Sign Language interpreter, a certified deaf interpreter, and a Spanish interpreter who interpreted for the deaf interpreter. When asked whether she was previously employed at the Marriott, Ms. R. testified, "I work before and then there was a closet and I said no. The folding table. I'm afraid. Someone grabbed me and I said no." When asked who grabbed her, she testified, "[h]is name is Miguel." Ms. R. testified that she was folding clothes on a table, putting them on shelves, when Fuentes came up to her and put his hands over her mouth. Ms. R. then fell down. When asked if he touched her anywhere else, she responded in the negative. She testified that he came up to her and she said "[n]o[,]" and that he "started," and she told him to stop. She demonstrated with two dolls indicating that Fuentes came up from the back, grabbed her, opened her zipper, pulled down her pants, and then "touched [her] behind and [she]

---

[1] To protect the privacy of the sexual assault victim, we will use only the first initial of her and her family members' surnames.

pushed him away." Afterwards, in pain, Ms. R. went to the bathroom and was surprised to see something red[2] coming from "the lower of [her] body[.]" A calendar from 2012 was admitted into evidence, and Ms. R. indicated that the events transpired in February 2012.

During trial, Ms. R. shrugged when the prosecutor asked if she saw Miguel in the courtroom, but she identified "Miguel" from a photograph the State introduced into evidence.[3]

Ms. M., Ms. R.'s mother, worked at the Marriott as a cook. Ms. M. characterized Ms. R. as disabled, and stated that Ms. R. went to a high school where "there is a class for students with disabilities[,]" and indicated that it was "[t]he special school for disability[,]" from which Ms. R. graduated in 1998. Ms. M. testified that Ms. R. is not able to cook for herself or go to work by herself, and Ms. M. had difficulties talking with her. Ms. M. further testified that Ms. R. maintained her job in the housekeeping department at the

---

[2] Ms. R. testified, "I'm not sure what it was. Blood, urine, water."

[3] During direct examination of Ms. R., the following exchange occurred:

BY [PROSECUTOR]:

Q. [Ms. R], I'm showing you State's Exhibit 3. Could you look at it? Do you recognize it?

A. M-i-g-u-e-l.

Q. Is this Miguel, the person you said put his penis in your vagina?

A. Yes. Yes.

Marriott for fourteen and a half years.    In February and March of 2012,[4] Ms. M. noticed that her daughter's demeanor had changed.  Ms. M. noticed her daughter crying on several occasions.  Ms. M. initially attributed the change to the death of her husband, Ms. R.'s stepfather, which occurred in February 2012.  By May 2012, she noticed that Ms. R. was gaining weight.  A June 2012 blood test revealed that Ms. R. was pregnant.  When Ms. M. asked who had impregnated her, Ms. R. "wrote [Miguel's] name."[5]  Ms. M. reported the situation to the Marriott administration and the Office of the State's Attorney.

Ms. R. gave birth to a daughter in November, 2012.  Vanessa Covert, a DNA analyst, testified that the results of a paternity test indicated that there was a 99.9999996% probability that Fuentes was the child's father.

Bonnie Bland, an employee at Humana, an organization that helps the disabled, knew Ms. R. through case management and job coaching.  Ms. Bland met with Ms. R. monthly and tried to help her develop skills in order to look for jobs and to maintain her

---

[4] Ms. M. testified, "[s]he changed in 2012, in March.  She was crying, she was trembling, she was frightened.  If she was in the kitchen and somebody was coming behind her, she would jump."  Ms. M. stated, "[Ms. R.] was crying when she was awake.  She was crying in her sleep.  When I would arrive home at midnight after work, I would find her awake.  She was with her Bible, and she would be shaking."  When asked if she saw Ms. R. in February, Ms. M testified, "Yes. . . . at midnight, crying and shaking."

[5] Ms. M. knew Fuentes as a Marriott employee through her own former employment as a cook at the hotel.  During cross-examination of Ms. M, the following exchange occurred:

BY [DEFENSE COUNSEL]:

Q. [Ms. R.] told you Miguel was the one that impregnated her, correct?

A. She wrote his name.

job. Ms. Bland testified that Ms. R. "has so many disabilities," "has limited language[,]" and was "not able to express herself." Although Ms. R. uses "broken English signs[]" to communicate with Ms. Bland, Ms. Bland, who is also deaf, stated that she is able to understand Ms. R.

S.R., Ms. R.'s sister, testified that she communicated with her through signs the siblings developed as children.[6] S.R. usually understood her sister, but they would have difficulty communicating with one another. S.R. stated that Ms. R. cannot be left alone in the house.

Detective Nicholas Collins of the Prince George's County Police Department was the lead investigator in the case. He interviewed Ms. R. on June 14, 2012, with the assistance of a sign language interpreter. He testified that she had difficulty understanding and responding to his questions. He further testified that "it took [Ms. R.] about five minutes to explain that" the man alleged to have raped her bent her over a chair and locked the door.

In his defense, Fuentes presented the testimony of three co-workers from the hotel. When asked to describe Ms. R., Eleticia Hernandez, a former co-worker at Marriott, stated that Ms. R. is "[a] girl that is intelligent. She knows her job." Ms. Hernandez further testified that Fuentes was a serious, respectful man, and a good worker. Roxana Martinez, another employee of the Marriott, worked with Fuentes for fourteen years and also worked

---

[6] When asked on direct examination how S.R. communicates with Ms. R., she testified, "[i]t's signs that we learned at home from the time that we were children. I can't say that it's ASL because it's not. I don't know a lot of ASL. Just some words. But other phrases are from signs that we know."

with Ms. R. She thought that Fuentes and Ms. R. were friends. She observed Fuentes and Ms. R. at work and noted that they often ate lunch together. Ms. Martinez did not know sign language but was able to communicate with Ms. R. through gestures. She stated that Fuentes was an honest and decent worker. Liliana Fuentes, Fuentes' daughter, and also an employee at the Marriott, testified that she was friends with Ms. R., and that she could communicate with her despite not knowing sign language. Ms. Fuentes noticed that Ms. R. "follow[ed] [Fuentes] all the time."

Fuentes, a fifty-nine-year-old father of six, worked at the Marriott for nineteen years. He had known Ms. R. for fourteen years prior to the incident. Once she started working in housekeeping, they would see each other "all the time, because [they] had to use the same elevator." Fuentes admitted to having sexual contact with Ms. R., but claimed it was consensual and initiated by Ms. R. He further testified that she had touched him inappropriately before and that he had informed her mother of the behavior. He testified that on the date in question, he encountered Ms. R. on the third floor and then accompanied her to a closet on the fourth floor. He further testified that she opened the closet and made a motion to him to go inside, and he complied. According to Fuentes, they then engaged in consensual sexual intercourse.

Fuentes moved for a judgment of acquittal at the close of the State's case-in-chief, and renewed his motion at the close of all evidence. Both motions were denied by the trial court.

## DISCUSSION

## I.

Fuentes first argues that the evidence was legally insufficient because his convictions were contingent on Ms. R.'s status as a mentally defective individual and the State failed to establish that she had been diagnosed with either mental retardation or a mental disorder. Fuentes argues that on this record, no rational juror could find, beyond a reasonable doubt, that Ms. R. was either mentally retarded or suffered from a mental disorder.

The State counters that the plain language and legislative history of Crim. Law § 3-301 and Maryland case law, do not support Fuentes' statutory construction. Furthermore, the State argues that Fuentes incorrectly points to definitions in other titles of the Maryland Code, because there is statutory language that limits the scope of those definitions to their particular title, without statutory language incorporating those definitions in the Criminal Law Article. The State contends that courts in other jurisdictions have held that expert evidence is not required to establish that a victim lacked the mental capacity to consent to sexual acts. Lastly, the State avers that lay testimony, and the jury's observation of the victim during her testimony, was sufficient to demonstrate that she had a mental disorder.

In determining whether the evidence is legally sufficient, we examine the record solely to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *McKenzie v. State*, 407 Md. 120, 136, 962 A.2d 998, 1007 (2008) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560, 571 (1979)). In examining the record, we view the

State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State. *State v. Rendelman*, 404 Md. 500, 513–14, 947 A.2d 546, 553 (2008) (citing *Harrison v. State*, 382 Md. 477, 487–88, 855 A.2d 1220, 1226 (2004)); *State v. Suddith*, 379 Md. 425, 429–31, 842 A.2d 716, 718–19 (2004) (citing *State v. Smith*, 374 Md. 527, 533–34, 823 A.2d 664, 668 (2003)). In so doing, "[i]t is not our role to retry the case." *Smith v. State,* 415 Md. 174, 185, 999 A.2d 986, 992 (2010). Rather, "[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id.* (citing *Tarray v. State*, 410 Md. 594, 608, 979 A.2d 729, 737 (2009)). We defer to any possible reasonable inferences the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence. *Smith,* 374 Md. at 557, 823 A.2d at 682; *see also State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336, 337 (1994) ("[I]t is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case.").

Second-degree rape is defined by Crim. Law § 3-304(a), which provides in relevant part:

**Prohibited**

(a) A person may not engage in vaginal intercourse with another:

(1) by force, or the threat of force, without the consent of the other;

(2) if the victim is a mentally defective[7] individual, a mentally incapacitated individual, or a physically helpless individual, and the person performing the act knows or reasonably should know that the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual[.]

* * *

**Penalty**

(c)(1) Except as provided in paragraph (2) of this subsection, a person who violates subsection (a) of this section is guilty of the felony of rape in the second degree and on conviction is subject to imprisonment for not exceeding 20 years.

Third-degree sexual offense is proscribed by Crim. Law § 3-307:

**Prohibited**

(a) A person may not:

(1)(i) engage in sexual contact with another without the consent of the other; and

(ii) 1. employ or display a dangerous weapon, or a physical object that the victim reasonably believes is a dangerous weapon;

2. suffocate, strangle, disfigure, or inflict serious physical injury on the victim or another in the course of committing the crime;

3. threaten, or place the victim in fear, that the victim, or an individual known to the victim, imminently will be subject to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or

4. commit the crime while aided and abetted by another;

---

[7] Effective October 1, 2016, the criminal statutes relating to certain sexual offenses, including those at issue here, changed references from the term "mentally defective" to "substantially cognitively impaired." The term "mental retardation" was changed to "intellectual disability."

(2) engage in sexual contact with another if the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual, and the person performing the act knows or reasonably should know the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual[.]

\* \* \*

**Penalty**

(b) A person who violates this section is guilty of the felony of sexual offense in the third degree and on conviction is subject to imprisonment not exceeding 10 years.

When second-degree rape or third-degree sexual offense involving a legally incompetent victim is charged pursuant to Crim. Law §§ 3-304(a)(2) or 3-307(a)(2), "lack of consent does not have to be established independently by showing either resistance or fear of resistance but is automatically established, as a matter of law, by the status of the victim." *See Travis v. State*, 218 Md. App. 410, 428–29, 98 A.3d 281, 291–92 (2014). The three classes of individuals in Crim. Law §§ 3-304(a)(2) and 3-307(a)(2)—mentally defective individuals, mentally incapacitated individuals, and physically helpless individuals—"are incapable of consenting[,]" and thus, "[t]he State is relieved from having to prove directly what it has already proved indirectly." *Id.* at 429, 98 A.3d at 292. Lack of consent "does not have to be proved directly not because it is not required but only because it is implicit in the victim's condition." *Id.* at 431, 98 A.3d at 293.

Lastly, Crim. Law § 3-301 defines "mentally defective individual[:]"

**In general**

(a) In this subtitle the following words have the meanings indicated.

**Mentally defective individual**

(b) "Mentally defective individual" means an individual who suffers from mental retardation or a mental disorder, either of which temporarily or permanently renders the individual substantially incapable of:

(1) appraising the nature of the individual's conduct;

(2) resisting vaginal intercourse, a sexual act, or sexual contact; or

(3) communicating unwillingness to submit to vaginal intercourse, a sexual act, or sexual contact.

To sustain a conviction of second-degree rape under Crim. Law § 3-304(a)(2), the State was required to prove beyond a reasonable doubt that: (1) Fuentes had vaginal intercourse with Ms. R.; (2) Ms. R. was mentally defective, mentally incapacitated, or physically helpless; and (3) Fuentes knew or reasonably should have known that Ms. R. was mentally defective, mentally incapacitated, or physically helpless. To sustain a conviction of the crime of third-degree sexual offense under Crim. Law § 3-307(a)(2), the State was required to prove beyond a reasonable doubt that: (1) Fuentes engaged in sexual contact with Ms. R.; (2) Ms. R. was mentally defective, mentally incapacitated, or physically helpless; and (3) Fuentes knew or reasonably should have known that Ms. R. was mentally defective, mentally incapacitated, or physically helpless.

There is no dispute that Fuentes engaged in sexual contact with Ms. R. and had vaginal intercourse with her. Here, we must determine whether the evidence was sufficient

to prove that Ms. R. was a mentally defective individual, and, if so, whether Fuentes knew or reasonably should have known that she was a mentally defective individual.[8]

Fuentes argues that "[b]oth 'mental retardation' and 'mental disorder' are medical diagnoses made by medical professionals based on specific and established scientific evidence after thorough and rigorous examination of the patient."  Accordingly, he argues that without medical evidence that Ms. R. was diagnosed with mental retardation or a mental disorder, the jury could not find that Ms. R. was mentally defective.  We disagree.

Fuentes recognizes that the term "mental disorder" is not defined in Crim. Law § 3-301, but asks this Court to adopt the definition contained in the Health - General Article and/or the Criminal Procedure Article of the Maryland Code.  The General Assembly, however, could have, but did not adopt the definition of the term as defined in the Health - General or Criminal Procedure Articles.

The General Assembly knows how to explicitly incorporate definitions from other titles, yet did not do so here.  *See Holmes v. State*, 362 Md. 190, 195 n. 2, 763 A.2d 737, 739 n. 2 (2000) (stating that "when the Legislature chooses to permit home detention as a condition of probation, it knows how to do so.").  The Criminal Law Article contains examples of explicit incorporation of definitions from other articles, including Health -

---

[8] Fuentes contends that the jury's acquittal of the second-degree assault and fourth-degree sexual offense charges "clearly indicates that his conviction was based on the jury's determination that Ms. R. was a 'mentally defective individual.'"  We agree with our brethren on the Court of Special Appeals that the jury's verdict appears to support Fuentes' interpretation, as second-degree assault would necessarily be a lesser included offense of second-degree rape by force or threat of force.

General.[9]  There are six statutes, in three different articles, that explicitly incorporate the definition of "mental disorder" contained in § 10-101 of the Health - General Article.  For example, the Correctional Services Article has a provision regarding expenses for treatment in a state facility that provides: "A county or managing official is not responsible for payment for services or treatment rendered to an inmate as a result of admission to a State facility for individuals who have *mental disorders as defined by in § 10-101(i) of the Health - General Article*."  Md. Code Ann., Correctional Services § 11-204 (emphasis added).  The Family Law Article explicitly incorporates that same definition: "'Disability' means: . . . *mental disorder, as defined in § 10-101 of the Health - General Article . . . .*"  Md. Code Ann., Family Law § 5-101(f)(3) (emphasis added).  The Public Safety Article explicitly incorporates that definition in four different statutes.[10]

---

[9] *See, e.g.*, Crim. Law § 2-103(a) ("For purposes of a prosecution under this title, 'viable' has the meaning stated in § 20-209 of the Health - General Article."); Crim. Law § 4-201(d)(4) ("a Montgomery County fire and explosive investigator as defined in § 2-208.1 of the Criminal Procedure Article[]"); Crim. Law § 8-508(f)(1)(iii) ("a private health insurance carrier, health maintenance organization, managed care organization as defined in § 15-101 of the Health - General Article[]"); Crim. Law § 10-204(a)(2)(i)(1.) ("a facility as defined in § 10-101 of the Health - General Article[]").

[10] Md. Code Ann., Public Safety § 5-118(b)(3)(vii) (in a provision regarding a firearm application that provides that the application must include a statement that the applicant "does not suffer from a mental disorder as defined in § 10-101(i)(2) of the Health - General Article . . ."); Md. Code Ann., Public Safety § 5-133(b)(6) ("a person may not possess a regulated firearm if the person . . . . suffers from a mental disorder as defined in § 10- 101(i)(2) of the Health - General Article . . ."); Md. Code Ann., Public Safety § 5-134(b)(8) ("A dealer or other person may not sell, rent, or transfer a regulated firearm to a purchaser, lessee, or transferee who the dealer or other person knows or has reasonable cause to believe . . . suffers from a mental disorder as defined in § 10-101(i)(2) of the Health - General Article . . . ."); Md. Code Ann., Public Safety § 5-205(b) ("A person may not possess a rifle or shotgun if the person: . . . (6) suffers from a mental disorder as defined

(continued . . .)

- 13 -

One statute explicitly incorporates both definitions cited by Fuentes: "'Mental facility' means any place providing a clinic, hospital, day residential or other programs, public or private, other than a veterans' hospital, which purports to or does provide treatment for persons suffering *from mental disorders as defined in § 10-101(i) of the Health - General Article or § 3-101(g) of the Criminal Procedure Article . . . .*" Md. Code. Ann., Estates & Trusts § 13-101(m) (emphasis added).

In addition, another subtitle of the Health - General Article has a definition of "mental disorder," that is unlike those cited by Fuentes:

(e)(1) "Mental disorder" means the behavioral or other symptoms that indicate:

(i) To a lay petitioner who is submitting an emergency petition, a clear disturbance in the mental functioning of another individual; and

(ii) To the following health professionals doing an examination, at least one mental disorder that is described in the version of the American Psychiatric Association's "Diagnostic and Statistical Manual--Mental Disorders" that is current at the time of the examination:

\*\*\*

(2) "Mental disorder" does not include intellectual disability.

---

(. . . continued)

in § 10-101(i)(2) of the Health - General Article . . . ."); *see also* Md. Code Ann., Courts & Judicial Proceedings § 3-8A-17.7 ("At a competency hearing, if the court determines that the child is incompetent to proceed, is unlikely to attain competency in the foreseeable future, has a mental disorder, as defined in § 10-620 of the Health - General Article . . . .").

Md. Code Ann., Health - General § 10-620. In enacting Crim. Law § 3-301, the General Assembly did not adopt the definition of the term "mental disorder" as set forth in the Health - General or Criminal Procedure Articles. Therefore, we reject Fuentes' suggestion that we import the definition from one or both of those articles.

Cases from other jurisdictions have also come to the conclusion that expert evidence is not required to establish that a victim lacked the mental capacity to consent to sexual acts. *See State v. Hunt*, 722 S.E.2d 484, 492 (N.C. 2012) (concluding that the State was not required in that case to use expert testimony to establish the extent of the victim's mental capacity to consent to sexual acts)*; see also State v. Collins*, 7 Neb. App. 187, 202, 583 N.W.2d 341, 350–51 (1998); *Jackson v. State*, 890 P.2d 587, 589–90 (Alaska Ct. App. 1995); *State v. Summers*, 70 Wash. App. 424, 428–29, 853 P.2d 953, 955–56 (1993).

We hold that evidence of a medical diagnosis is not required to establish that a victim is mentally defective as defined by Crim. Law § 3-301(b). The statutes at hand, Crim. Law §§ 3-301(b), 3-304(a)(2), and 3-307(a)(2), protect a class of vulnerable individuals, and the requirement of medical evidence would not conform with the statutes' protection. Thus, in cases such as this, a court must determine whether the evidence was sufficient on the question of whether the victim was capable of consent. Here, although no medical evidence or expert testimony was presented to establish that Ms. R. suffered from a mental defect, the jury was able to observe Ms. R. and assess her mental capacity. Further, the jury heard the following testimony to support its finding that Ms. R. was mentally defective as defined by Crim. Law § 3-301(b):

1) Ms. R.'s mother testified that Ms. R. is not able to go to work, cook, or go to the store by herself.

2) Ms. R.'s mother said Ms. R. went to a high school where "there is a class for students with disabilities" and indicated that it was "[t]he special school for disability."

3) Bonnie Bland, a "case manager/job coach[]" who worked with Ms. R. at Humana, an organization that "helps people with disabilities[,]" providing "case management and job coaching[,]" testified for the State regarding Ms. R.'s capabilities.

4) Ms. Bland testified that "[b]ecause [Ms. R.] has so many disabilities, she has limited language. She's not able to express herself."

5) Ms. R.'s sister testified that "she's never been by herself. There's always been somebody at home when she's there."

6) Ms. R.'s sister said that sometimes Ms. R. "repeats what I have just communicated. . . . If she's just shadowing what I'm saying to her, then there's no way to communicate because we can't advance from that point."

7) Ms. R.'s sister testified that the victim "couldn't take care of herself for a whole day[]" and "would never be able to take care of herself. We never tried to do that to try to find out."

In addition, the jury was able to observe Ms. R.'s demeanor when she testified and draw inferences relative to her limited ability to communicate. We agree with the Court of Special Appeals that the jury was able to reasonably infer that Ms. R. suffered from a mental defect which rendered her incapable of consenting to sexual intercourse and sexual contact under Crim. Law §§ 3-304(a)(2) and 3-307(a)(2).[11] Further, the jury reasonably

---

[11] Fuentes suggests that the fact that Ms. R. communicated "her unwillingness to submit to the sexual act, and that she physically resisted the act[] . . . brings any determination of her as a 'mentally defective individual' into serious question[.]" We agree with the State that the jury was able to believe all, part, or none of the testimony, including the victim's testimony.

could have inferred that Fuentes knew or reasonably should have known of her mental deficits, given their fourteen-year work relationship and the testimony presented at trial regarding their relationship. Thus, the evidence was sufficient to prove the crimes of second-degree rape and third-degree sexual offense.

**II.**

Fuentes next argues that the trial court erred in allowing the State to inform the jury during rebuttal closing argument that Fuentes had admitted to taking advantage of Ms. R.'s "mental diminished capacity" in an interview that was never admitted at trial. The prosecutor's argument referred to Fuentes' interview with Marriott security personnel on June 7, 2012. The prosecutor cross-examined Fuentes regarding that interview:

Q. Okay. And you realized working with her that she has diminished capacity, correct?

A. Because she wouldn't talk and she could not hear.

Q. But you also knew that she had issues with comprehension, correct?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Approach the bench.

(Whereupon, counsel approached the bench and the following ensued.)

[DEFENSE COUNSEL]: There's been no evidence about -- there's been no testimony provided from anybody else that's been the overriding issue in this case; that there is no expert witness and expert testimony regarding the victim's mental capacity or incapacity, for that matter. I think the questions that are being asked of my client are highly prejudicial and the impact that could have on the jury, that was the basis for my objection.

THE COURT: I think some form of your question is appropriate. If I hear another question that's more appropriate, I'll overrule.

- 17 -

[DEFENSE COUNSEL]: Thank you, Your Honor.

(Whereupon, counsel returned to the trial tables and proceedings resumed in open court.)

BY [PROSECUTOR]:

Q. When you were training her, you had to go over things more than once, correct?

A. Yes.

Q. And they were basic things she had to do, correct?

A. Yes.

Q. And there was a lot of things she didn't understand, correct?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

BY [PROSECUTOR]:

Q. Did she understand everything -- did she seem to understand everything you were saying to her?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

BY [PROSECUTOR]:

A. Yes, she did.  She understood.

Q. She understood everything you would say, correct?

A. Not everything but most of the things.

Q. And on June 7, 2012, you were interviewed by Alex Roche from Marriott?

A. Yes.

- 18 -

Q. And you told him that you acknowledge and stated that you took advantage of [Ms. R.] considering her mental state and diminished capacity, correct?

A. No.

Q. You did not say that?

A. No.

Upon re-direct, Fuentes stated that the document comprising his statement to Marriott security was written in English and given to him, so he signed it, notwithstanding the fact that he does not read English and did not know what was written on the document. The written statement, itself, marked for identification as defense exhibit number six, was not entered into evidence.

During rebuttal closing argument, the prosecutor referred to this interview conducted by Marriott security staff on June 7, 2012 after Ms. M. reported the alleged rape of her daughter:

> [PROSECUTOR]: . . . He [DEFENSE COUNSEL] will also have you believe that the defendant doesn't speak enough English, and so when he was interviewed on June 7th by the Marriott security, he didn't understand and they made him sign it, and so when he said that he took advantage of her mental diminished mental capacity --
>
> [DEFENSE COUNSEL]: Objection, Your Honor. Can we approach?
>
> THE COURT: Sure.
>
> (Whereupon, counsel approached the bench and the following ensued.)
>
> [DEFENSE COUNSEL]: Your Honor, that's not in evidence. That's not in evidence, one, and anywhere mentioned in the question that was attempted to have been asked regarding his mental -- his understanding of her mental capacity was objected to and Your Honor sustained the objection.

[PROSECUTOR]: He testified -- when I asked him about it, he said that he didn't understand what was given to him, that he doesn't understand English, that they made him sign it. I asked him.

[DEFENSE COUNSEL]: Correct.

[PROSECUTOR]: And I'm only saying as to what the actual statement said. Not whether he understood whether he thought she had mental capacity issues.

[DEFENSE COUNSEL]: That information that was elicited regarding any sort of mental understanding on his part, anything that was written in the statement did not come into evidence. That was not -- that question was not asked of my client. It was not asked whether he understood what those letters meant, that information did not come because it was objected to.

[PROSECUTOR]: I specifically asked it and actually read from it. And then he said, he answered, he said, [o]h, they just gave it to me. I didn't know what was said in it. They just told me to sign it.

THE COURT: I'm going to overrule it, but I'm going to instruct the jury that they are to rely on their own memory of the evidence.

[PROSECUTOR]: Thank you.

[DEFENSE COUNSEL]: Thank you.

During jury instructions, the court instructed the jury: "But I will remind you that you have your notes and your memory. And if your memory from the evidence differs from anything that I or the lawyers may say, you must rely on your own memory."

Fuentes contends that the prosecutor's comments during rebuttal closing argument were improper because they referred to facts not in evidence and that he suffered unfair prejudice as a result. "The regulation of argument rests within the sound discretion of the trial court." *Grandison v. State*, 341 Md. 175, 224, 670 A.2d 398, 421 (1995). Generally, "[t]he prosecutor is allowed liberal freedom of speech and may make any comment that is

warranted by the evidence or inferences reasonably drawn therefrom." *Whaley v. State*, 186 Md. App. 429, 452, 974 A.2d 951, 964 (2009) (quoting *Spain v. State*, 386 Md. 145, 152, 872 A.2d 25, 29 (2005)).  Nonetheless, "not all statements are permissible during closing arguments." *Donaldson v. State*, 416 Md. 467, 489, 7 A.3d 84, 97 (2010).  "For instance, counsel may not 'comment on facts not in evidence or . . . state what he or she would have proven.'" *Mitchell v. State*, 408 Md. 368, 381, 969 A.2d 989, 997 (2009) (quoting *Smith and Mack v. State*, 388 Md. 468, 488, 880 A.2d 288, 299 (2005)).

Arguing facts not in evidence is highly improper.  *See, e.g.*, *Lawson v. State*, 389 Md. 570, 591, 886 A.2d 876, 888 (2005) (prosecutor may make arguments warranted by evidence or reasonable inferences therefrom); *Spain v. State*, 386 Md. 145, 156, 872 A.2d 25, 31 (2005) ("Courts consistently have deemed improper comments made during closing argument that invite the jury to draw inferences from information that was not admitted at trial.").  In rebuttal, the prosecutor stated that, during Fuentes' June 7, 2012 interview, he acknowledged to Marriott security staff that he took advantage of Ms. R.'s diminished mental capacity.  This alleged statement was never admitted into evidence, and Fuentes' responses to the relevant questions concerning its contents were in the negative.  Therefore, the prosecutor's argument to the court, upon defense counsel's objection to her rebuttal closing, that "I'm only saying as to what the actual statement said[,]" was misplaced.

The State argues that the jury could have disbelieved Fuentes' testimony that he did not acknowledge and state to Marriott security staff that he took advantage of Ms. R., given her mental state and diminished capacity.  That is, the State contends that the jury could have disbelieved Fuentes' denial that he made this statement.  The State then claims that,

from this disbelief of Fuentes' denial, the jury could have found that Fuentes actually did acknowledge and state to Marriott security staff that he took advantage of Ms. R.'s mental state and diminished capacity. In support, the State contends that while it is well established that disbelief of testimony is not the same as finding evidence to the contrary, there is an exception for scienter—the "knowledge that makes a person legally responsible for the consequences of his or her act or omission[.]" SCIENTER, Black's Law Dictionary (10th ed. 2014); *see Hayette v. State*, 199 Md. 140, 145, 85 A.2d 790, 792 (1952) (recognizing the scienter exception and stating that "[o]rdinarily disbelieving evidence is not the same thing as finding evidence to the contrary. But on questions of scienter reason for disbelieving evidence denying scienter may also justify finding scienter."); *Marini v. State*, 30 Md. App. 19, 30–31, 351 A.2d 463, 470 (1976) ("Generally, disbelieving evidence provides no basis for finding evidence to the contrary; however, there is an exception involving scienter or guilty knowledge, i.e., reasons for disbelieving a denial of scienter may provide a basis for finding scienter." (quoting *Carter v. State*, 10 Md. App. 50, 53, 267 A.2d 743, 745 (1970))).

The scienter exception is inapplicable because the relevant statement was never admitted into evidence. From an evidentiary standpoint, there is a key distinction between (1) a defendant's denial of scienter and (2) a defendant's denial of making a statement which allegedly admitted scienter. In the latter, the statement contains the evidence of scienter. Here, the statement was never admitted into evidence.

While denial of scienter may permit a finding of scienter, Fuentes' denial that he made a statement to Marriott personnel does not, alone, permit an evidentiary finding that

he, in fact, made this statement. *See Carter*, 10 Md. App. at 54, 267 A.2d at 745 ("The rule concerning finding scienter in no way affects other aspects of criminal law."). Fuentes' proffered admission of scienter in a statement to Marriott staff was not admitted as evidence. Thus, the prosecutor's argument was improper.

Not every improper comment by the prosecutor requires reversal, as error in closing argument is subject to harmless error review. *Lee v. State*, 405 Md. 148, 174, 950 A.2d 125, 140 (2008). "[T]he State bears the burden of proving that an error is harmless and must prove beyond a reasonable doubt that the contested error did not contribute to the verdict." *Id.* Moreover, "an error will be deemed harmless only if 'a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict. . . .'" *Simpson v. State*, 442 Md. 446, 457, 112 A.3d 941, 947 (2015) (quoting *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976)). Here, to determine "whether overruling defense objections to improper statements during closing argument constitutes reversible, or harmless, error," we focus our attention on three factors: first, "the weight of the evidence against the accused[;]" second, "the severity of the remarks, cumulatively[;]" and third, "the measures taken to cure any potential prejudice." *Id.* at 174, 950 A.2d at 140.

There is no dispute that Fuentes engaged in sexual contact and vaginal intercourse with Ms. R. Fuentes' unintroduced statement, which the prosecutor improperly referenced in closing argument, primarily supported a determination that Fuentes had *knowledge of* Ms. R.'s status as a mentally defective individual. *See* Crim. Law § 3-304(a)(2) (requiring that the State prove beyond a reasonable doubt that the defendant "knows *or reasonably*

- 23 -

*should know* that the victim is a mentally defective individual" (emphasis added)); Crim. Law § 3-307(a)(2) (same); *see also Travis v. State*, 218 Md. App. 410, 428–29, 98 A.3d 281, 291–92 (2014) (holding that there is a "significant evidentiary difference when the prosecutor sets out to prove a case of rape" involving legally incompetent victims, as "lack of consent . . . is automatically established as a matter of law, by the status of the victim."). To the extent that Ms. R. had a mental defect, the State's case was strong pertaining to a determination that Fuentes, at a minimum, reasonably should have known of it.  As the State asserts, this is not a matter in which a defendant first meets the victim briefly before the alleged sexual offense.  It was undisputed that Fuentes worked with the victim for over a decade.  Fuentes testified that he had extensive contact with her.  In closing argument, defense counsel argued that Fuentes and Ms. R. "sat together at a minimum of 15 years and broke bread together."

Significantly, Fuentes' testimony contains an ambiguity that could reasonably be construed as an admission of his knowledge of Ms. R.'s mental defect.  On cross-examination, this exchange occurred:

Q. Okay.  And you realized working with her that she has diminished capacity, correct?

A. Because she wouldn't talk and she could not hear.

Although Fuentes' answer may be susceptible to more than one interpretation, his failure to deny knowledge of Ms. R.'s diminished mental capacity, together with the duration of their working relationship, strongly supports a finding that he knew or reasonably should have known of her diminished capacity.

- 24 -

Lastly, we look at the measures taken to cure any potential prejudice. Shortly after Fuentes' objection, at the close of the State's rebuttal closing argument, the trial court's instruction reminded the jurors to rely on their "own memory" of the testimony. *See Lawson*, 389 Md. at 601, 886 A.2d at 894; *Spain*, 386 Md. at 159–60, 872 A.2d at 33–34. *Spain* is instructive. In *Spain*, 386 Md. at 151, 872 A.2d at 29, the trial judge, in response to an objection by defense counsel, which was overruled, informed the jury "that this of course is closing argument, and that they will [consider the statements to be] lawyers' arguments." We also concluded:

> More importantly, however, before jury deliberations began, the trial judge gave, among others, a jury instruction, based on Maryland Criminal Pattern Jury Instructions § 3:10, that emphasized the argumentative nature of closing arguments, and explicitly instructed the jurors as to relevant factors to consider . . . . Maryland courts long have subscribed to the presumption that juries are able to follow the instructions given to them by the trial judge, particularly where the record reveals no overt act on the jury's part to the contrary.

*Id.* at 160, 872 A.2d at 34 (citing *Wilson v. State*, 261 Md. 551, 570, 276 A.2d 214, 223–24 (1971); *Brooks v. State*, 85 Md. App. 355, 360–61, 584 A.2d 82, 85 (1991)). Similarly, here, we determine that the trial judge's instruction ameliorated any prejudice that may have been caused by the prosecutor's improper argument.

Under these particular circumstances, given: (1) the undisputed evidence that Fuentes and Ms. R. engaged in sexual contact and vaginal intercourse, (2) the evidence regarding the extent that Ms. R exhibited a mental defect, (3) the duration of the relationship between Fuentes and Ms. R., which supports the determination that Fuentes, at a minimum, reasonably should have been aware of her mental defect, (4) Fuentes' failure

to deny knowledge of her diminished mental capacity on cross-examination, and (5) the trial court's instruction, the prosecutor's improper argument does not warrant reversal. Accordingly, we are convinced beyond a reasonable doubt that the error in no way influenced the verdict. *Dorsey*, 276 Md. at 659, 350 A.2d at 678.

## III.

Lastly, Fuentes argues that the trial court erred when it declined to admit into evidence, on relevance grounds, over 300 pages of Ms. R.'s employment records from the Marriott.[12] These records included performance evaluations dating back to 1998. Fuentes contends that these records supported a finding regarding her ability to maintain her employment and perform her job duties independently. He claims that these records contradicted the State's claim that she suffered from a mental defect.

At the conclusion of evidence, defense counsel sought to admit employee records from Marriott, including performance evaluations of Ms. R. The trial court excluded the evidence:

> [DEFENSE COUNSEL]: Thank you, Your Honor. And I do have one more. This is the records from Marriott, the work records. There were performance evaluations of the victim and certificates. I put the State on notice as well. I

---

[12] Prior to oral argument in this matter, the Court considered Petitioner's "Motion to File Record Extract Under Seal[,]" which referenced the denial at trial of the admission of Defendant's Exhibit 7, and raised an issue concerning the public disclosure of the complaining witness' "personal financial information" contained therein. The Court granted the Motion on December 28, 2016. Subsequently, the Court issued a Show Cause Order on June 26, 2017, directing the parties to show cause as to why the Court should not amend its Order of December 28, 2016 to unseal the record extract, except to the extent of any "personal financial information" contained therein. Upon consideration of the responses received from the parties, the Court amends its Order of December 28, 2016 to unseal the record extract, except to the extent of any "personal financial information" contained therein.

am inclined to have this marked as Defendant's Exhibit Number 7 and move that into evidence at this time.

[PROSECUTOR]: I will object, Your Honor.  The State hasn't gotten a copy, hasn't been able to review any of this to see what exactly is in it and that there might be some things that might not be relevant or appropriate to be in there.  And it's quite lengthy and I'm just being shown this.

[DEFENSE COUNSEL]:  If I may, Your Honor, I provided appropriate notice within appropriate timeframe of the rules.  As a matter of fact, these documents were available.  They were made available to counsel.  On one occasion, I actually drove to State's attorney's office here in Upper Marlboro from Rockville to view any other documents that may have been in this case, which they had a right to see.  They were filed within statutory timeframe.  There was no objection filed, and within the rules, I would submit to Your Honor that they are relevant.  I do have the certification.

THE COURT: Yes, but what are they relevant to?

[DEFENSE COUNSEL]: They're relevant to show part of what's been made an issue is that she's doing one sort of menial task and it's all repetitive and the violations that are included and the 15 -- 14 years that she did work at the Marriott, she had her ability to communicate, her ability to perform the job, her ability to communicate the issues to perform the job, so she was much more self-sufficient than the State would argue to the jurors given the instruction that she's mentally defective to the point that she's not able to understand and perform other than robotic type of behavior.

[PROSECUTOR]: And I would object to that, Your Honor, because these people did not testify in any way.  I don't know what they're basing this on.  And I would just object.

THE COURT: I'm not going to allow it.

[DEFENSE COUNSEL]: Thank you, Your Honor.  If I could just have it marked for the record.

THE COURT: Sure.

[DEFENSE COUNSEL]: Thank you.

THE CLERK: Defendant's Exhibit Number 7 marked for identification.

- 27 -

"Relevant evidence" is defined by Md. Rule 5-401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-402 provides that "[e]vidence that is not relevant is not admissible." Moreover, "[t]rial judges do not have discretion to admit irrelevant evidence." *State v. Simms*, 420 Md. 705, 724, 25 A.3d 144, 155 (2011). We have stated that "[t]he determination of whether evidence is relevant is a matter of law, to be reviewed *de novo* by an appellate court." *DeLeon v. State*, 407 Md. 16, 20, 962 A.2d 383, 385 (2008).[13]

Here, the trial court asked defense counsel "what are [the work records] relevant to?" After considering argument from defense counsel regarding the records' proffered relevance, the trial court stated "I'm not going to allow it." Based on this exchange, we

---

[13] We emphasize that a trial court's threshold determination of whether evidence is relevant is a legal conclusion that is reviewed *de novo*. Through our *de novo* review, we determine that the trial court's exclusion of the work records, on relevance grounds, was legally correct. Here, the Court of Special Appeals conflated the appropriate standards of review, and incorrectly reviewed the determination of whether the employment records were relevant under the abuse of discretion standard. *Compare DeLeon v. State*, 407 Md. 16, 20, 962 A.2d 383, 385 (2008) ("The determination of whether evidence is relevant is a matter of law, to be reviewed *de novo* by an appellate court.") *and J.L. Matthews, Inc. v. Md.-Nat'l Capital Park & Planning*, 368 Md. 71, 92, 792 A.2d 288, 300 (2002) ("[W]hen the trial judge's ruling [on the admissibility of evidence] involves a legal question, we review the trial court's ruling *de novo*.") *with Merzbacher v. State*, 346 Md. 391, 404–05, 697 A.2d 432, 439 (1997) (emphasis added) ("*Once a finding of relevancy has been made*, we are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion.") *and J.L. Matthews, Inc.*, 368 Md. at 92 n. 18, 792 A.2d at 300 n. 18 (2002) (noting, for instance, that a trial court's weighing of the probative value of the evidence against its harmful effects is subject to the more deferential abuse of discretion standard).

determine that the trial court excluded the records on relevance grounds. Thus, we conduct a *de novo* review of the trial court's ruling.

Ms. R.'s employment records were irrelevant to a determination of whether she suffered from a mental defect that rendered her legally incapable of consenting. We agree with the State that the question of whether Ms. R. was able to perform various housekeeping duties was several inferential leaps removed from whether she was capable of "appraising the nature of the individual's conduct" of a sexual nature, or of "resisting vaginal intercourse, a sexual act, or sexual contact," or of "communicating unwillingness to submit to vaginal intercourse, a sexual act, or sexual contact." The records would not have made it more or less probable that Ms. R. met the legal definition of a mentally defective individual. The trial court's exclusion of the employment records was legally correct.

## CONCLUSION

For the reasons explained above, we shall affirm the Court of Special Appeals. We hold that evidence of a medical diagnosis is not required to establish that a victim is mentally defective so as to render him or her unable consent to sexual acts. We determine the error in the prosecutor's improper closing argument was harmless beyond a reasonable doubt. Lastly, the trial court properly excluded, on relevance grounds, over 300 pages of Ms. R.'s employment records from the Marriott.

**JUDGMENTS OF THE COURT OF SPECIAL APPEALS ARE AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

- 29 -

Judge Watts joins in judgment only.

Circuit Court for Prince George's County
Case No.: CT131280X
Argued: March 2, 2017

IN THE COURT OF APPEALS

OF MARYLAND

---

No. 64

September Term, 2016

---

MIGUEL A. FUENTES

v.

STATE OF MARYLAND

---

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

---

Dissenting Opinion by Adkins, J.

---

Filed: July 12, 2017

Because I believe that Ms. R.'s employment records are relevant, and their exclusion constitutes reversible error, I respectfully dissent.

Evidence is relevant if it has "**any tendency** to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401 (emphasis added). We have explained that evidence is relevant "when, through proper analysis and reasoning, it is related logically to a matter . . . that is properly provable in the case." *Snyder v. State*, 361 Md. 580, 591 (2000). The Majority concludes that Ms. R.'s employment records are not logically related to Ms. R.'s intellectual disabilities, which the State must prove in this case. It reasons that

> whether Ms. R. was able to perform various housekeeping duties was several inferential leaps removed from whether she was capable of "appraising the nature of the individual's conduct" of a sexual nature, or of "resisting vaginal intercourse, a sexual act, or sexual contact," or of "communicating unwillingness to submit to vaginal intercourse, a sexual act, or sexual contact." The records would not have made it more or less probable that Ms. R. met the legal definition of a mentally defective individual.

Maj. Slip Op. at 29. I disagree with the Majority's characterization of the employment records and do not find the connection to be so attenuated.

Ms. R.'s employment records could have rebutted or mitigated some of the testimony by her family members and given the jury more insight as to whether she was, in fact, a "mentally defective individual." The records, which were proffered by the defense, address more than Ms. R.'s ability "to perform various housekeeping duties." Indeed, they reveal that Ms. R. was able to, and even liked to, communicate with her

coworkers and supervisors. For example, one of Ms. R.'s annual performance reviews states, "We have developed ways of communication in spite of her inability to speak." Another evaluation says that she "manages to get her point [across] to fellow associates and management" and "having worked with her for several years now[ ] makes it easier." This evidence supports the testimony of Ms. R.'s coworkers, who stated that she was able to communicate with them. The records also speak to the extent of Ms. R.'s intellectual disability because they provide insight into whether she could "communicat[e] unwillingness to submit" to sexual intercourse—a critical issue in this case. Md. Code (1957, 2012 Repl. Vol.), § 3-301(b)(3) of the Criminal Law Article ("CR").

Ms. R.'s employment records contain other evidence that potentially undercuts the State's argument regarding the severity of Ms. R.'s intellectual disabilities. The records include quizzes about on-the-job safety in which Ms. R. answered questions about bloodborne pathogens and minimizing the risk of fire. They also contain emergency contact and change of address forms completed by Ms. R. They show that, at least to some extent, she is able to read and write. These records certainly have the tendency to make it less probable that Ms. R. was a "mentally defective individual" within the meaning of CR § 3-301(b).

The records are especially important—and their exclusion prejudicial—because the State presented rather limited evidence regarding Ms. R.'s intellectual abilities. It relied solely on lay testimony from Ms. R. and her family to show that Ms. R. was "mentally defective." Ms. R.'s mother testified that her daughter went to a high school for "students with disabilities," that she took her daughter to and from work, and that she reminded her

2

to perform certain daily tasks. Ms. R.'s sister testified that Ms. R. "couldn't take care of herself for a whole day." She further testified that she sometimes had difficulties communicating with Ms. R. Finally, when Ms. R. testified, the sign language interpreter had difficulty understanding her responses.

In light of this testimony pertaining to Ms. R.'s disabilities and difficulties communicating, excluding evidence to the contrary was not harmless. On this record, I cannot say that, beyond a reasonable doubt, the exclusion of Ms. R.'s employment records did not contribute to the guilty verdict against Fuentes. *See Simpson v. State*, 442 Md. 446, 457 (2015) ("[A]n error will be deemed harmless only if a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." (citation and internal quotation marks omitted)).

The Majority's harmless error analysis regarding Fuentes's written statement to hotel security is also troubling. It places undue weight on Fuentes's answer to the prosecutor's question, "[Y]ou realized working with [Ms. R.] that she has diminished capacity, correct?" Fuentes responded, "Because she wouldn't talk and she could not hear." The Majority acknowledges that his response is ambiguous, but then proceeds to accord it significance as a "failure to deny." Maj. Slip Op. at 24, 25–26. Fuentes's use of "because" and his follow-on explanation could be construed as an implicit admission that he knew the victim was of diminished capacity. But his answer may well have meant that he did not know she was intellectually impaired, only that she could not hear or speak. I submit that an admittedly ambiguous statement cannot logically be transformed into a

3

concrete "failure to deny" that "strongly supports a finding that he knew or reasonably should have known" that Ms. R. was intellectually disabled. Maj. Slip Op. at 24. This ambiguous statement does not tip the scales in favor of finding harmless error. Nor does it move the State closer to meeting its weighty burden of proof—that, beyond a reasonable doubt, the error in no way influenced the verdict.